[Crim. No. 22487. Feb. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ADAMS HOVEY, Defendant and Appellant.

552

COUNSEL

William Bennett Turner, under appointment by the Supreme Court, Donna Brorby, Elizabeth D. Laporte and Turner & Brorby for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Martin S. Kaye and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant Richard Adams Hovey appeals from a judgment imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), accompanied by a special circumstances finding that the murder was wilful, deliberate and premeditated and was committed during the commission of a kidnapping (former § 190.2, subd. (c)(3)(ii), part of the 1977 death penalty law under which defendant was tried). Defendant was also found guilty of kidnapping (§ 207), accompanied by the intentional infliction of great bodily injury (§ 12022.7). In addition, during

both the murder and kidnapping, it was found that defendant used a deadly weapon (§ 12022, subd. (b)). As will appear, we have concluded that the judgment should be affirmed in its entirety.[1]

## I. The Facts

On March 10, 1978, witness Anderson discovered victim Tina Salazar, an eight-year-old girl, lying severely injured on a roadside in Hayward. Tina was unconscious and bound hand and foot. Police officers observed that she was bleeding from the head and had sustained extremely serious injuries. Medical testimony disclosed that Tina had suffered approximately 14 stab or puncture wounds on both sides of her head. Although several doctors testified that the wounds appeared to have been caused by a blunt object, a neurosurgeon opined that the injuries were caused by a sharp instrument such as a knife. Tina died of her injuries on March 18. An autopsy disclosed multiple skull fractures and two skull puncture wounds consistent with some type of sharp pointed instrument.

Various witnesses had observed an old, light blue Ford car in the vicinity; witness Irons thought he saw a struggle occurring between a child and the male occupant of the car. Irons believed the man was hitting the child with some kind of object. When witness Anderson approached the scene, the blue car sped away. Anderson thereupon discovered victim Tina Salazar lying where the blue car had been parked. The evidence indicated that defendant owned a 1961 blue Ford automobile which he sold in May 1978, one month prior to his arrest. Witness Irons picked defendant's photograph from a photographic lineup as being similar to the man he saw in the car.

Following his arrest, defendant made statements to two different cellmates concerning the killing. Cellmate Hughes testified that defendant admitted killing a "Spanish girl" after abducting her from a sidewalk. According to Hughes, defendant further admitted that he was armed with a knife during the incident.[2] Defendant told Hughes that he preferred younger girls; he killed his victim because she kept pulling a bag from her head, and defendant feared that she would recognize and identify him.

Cellmate Lee, who was unavailable at trial and whose preliminary hearing testimony was read to the jury, testified that defendant admitted picking

---

[1] Defendant also filed a petition for habeas corpus alleging, among other things, that his trial counsel was ineffective. Because we concluded that the petition failed to state a prima facie case, we declined to issue an order to show cause or to consolidate the habeas corpus petition with the automatic appeal, but instead denied the petition outright. The United States Supreme Court denied certiorari on February 23, 1987. (479 U.S. 1104 [94 L.Ed.2d 187, 107 S.Ct. 1336].) Accordingly, we do not review defendant's habeas contentions in this opinion.

[2] Hughes on direct examination testified that defendant admitted killing his victim with the knife, but on cross-examination Hughes could not recall whether this admission was made.

up a little "Chicano" girl near a school, blindfolding and tying her, and driving down a dead end road where no one could see them. There, he "played" with her and then stabbed her in the head and face after her blindfold slipped and she saw defendant. According to Lee, defendant admitted that he liked to pick up girls and "play with them" which, according to Lee, meant "playing with their body." (We discuss defendant's challenges to the admissibility of Lee's testimony in a subsequent part of this opinion.)

In order to exclude guilt phase evidence regarding a *subsequent* child kidnapping by defendant, an offense deemed relevant to the issue of identity, defendant and his trial counsel stipulated in writing that defendant "acknowledge[s] taking possession of Tina Salazar against her will and driving her from her neighborhood," and further "acknowledge[s] doing the act which caused injuries which ultimately lead [*sic*] to [her] death . . . ."

The defense evidence at the guilt phase consisted of (1) testimony by a radiologist that, on the basis of Tina's X-rays, her injuries were not caused by a knife, except possibly the handle of a knife, and (2) certain evidence pertinent to defendant's challenge to his cellmate's testimony, discussed below. In addition, through cross-examination and argument, defense counsel attempted to dispute that the murder was premeditated, as required by the 1977 death penalty law. (Former § 190.2, subd. (c)(3).)

Following the jury's guilty verdict, the penalty phase commenced. The prosecution focused upon defendant's June 1978 kidnapping of a nine-year-old girl, Michele G., in Albany, an offense for which defendant was convicted. Defendant's penalty phase evidence consisted of testimony by various relatives and acquaintances regarding defendant's character and background, and a psychiatrist's testimony regarding defendant's mental illness (schizophrenia), and his supposed "loss of control" or panic when victim Salazar became frightened. On rebuttal, the prosecutor introduced evidence of defendant's reading child pornography, his successful completion in April 1978 of courses at an advancement training center, and his ability to function well in his job prior to his arrest. As indicated previously, the jury selected the death penalty, and the trial court sentenced defendant to death. The present appeal is automatic. (§ 1239.)

## II. CONTENTIONS AFFECTING THE GUILT PHASE

### A. *Sufficiency of Evidence of Premeditation*

Defendant first contends that the evidence of premeditation and deliberation was too insubstantial to support the special circumstance

finding. ■ Defendant relies upon the familiar tripartite test set forth in *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], which requires us to focus upon evidence of (1) the defendant's *planning* activity prior to the killing; (2) his *motive* to kill, derived from his prior relationship or conduct with the victim, and (3) the *manner* of killing, indicating some preconceived design to kill in a certain way. Evidence of all three elements is not essential, however, to sustain a conviction. As we stated in *Anderson*, an appellate court will sustain a conviction where there exists evidence of all three elements, where there is "extremely strong" evidence of prior planning activity, or where there exists evidence of a motive to kill, coupled with evidence of either planning activity or a manner of killing which indicates a preconceived design to kill. (*Ibid*.) ■ As will appear, in the present case the record contains substantial evidence of each of *Anderson's* three elements.

Although the evidence was in some conflict on this point, the jury could conclude that defendant was armed with a knife or other weapon capable of stabbing. He kidnapped his young victim, tied and blindfolded her, and drove her to a place he considered secluded. Although not conclusive proof of a prior plan to kill, such evidence is certainly substantial evidence thereof. As we recently stated in a strikingly similar case involving the kidnapping/stabbing of a 12-year-old girl, "[W]hen one plans a felony [kidnapping] against a far weaker victim, takes her by force or fear to an isolated location, and brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset. [Citations.] Thus, there is substantial evidence of a 'planned' killing—the most important prong of the *Anderson* test." (*People* v. *Alcala* (1984) 36 Cal.3d 604, 626-627 [205 Cal.Rptr. 775, 685 P.2d 1126].)

As for motive, the testimony of defendant's cellmates indicates that he killed Tina because her blindfold slipped and enabled her to view defendant adequately to identify him to the authorities. Once again, *Alcala* is pertinent: "The evidence . . . suggests that defendant had committed a serious felony, kidnaping, on the victim and believed she was the only person who could implicate him. '[H]ence he could [surmise] that by killing her . . ., he would eliminate the only [witness] to his [crime].' [Citations.]" (*Alcala, supra*, at p. 627.)

Finally, as for the manner of killing, the evidence indicated that defendant stabbed or beat Tina repeatedly in the head. As in *Alcala*, where the victim was "all cut up," such a brutal method of injuring his victim, coupled with the foregoing evidence of planning and motive, "supports the inference of a calculated design to ensure death, rather than an unconsidered 'explosion' of violence. [Citation.]" (*Alcala, supra*, at p. 627;

see also *People* v. *Cruz* (1980) 26 Cal.3d 233, 245 [162 Cal.Rptr. 1, 605 P.2d 830].)

Defendant naturally views the evidence differently. Relying on the testimony of several doctors, defendant disputes the suggestion that Tina was stabbed with a knife, and he observes that the record does not show that defendant brought a knife or other weapon with him to the crime scene. (Both cellmates Hughes and Lee, however, stated that defendant admitted being armed with a knife.) But the jury was entitled to rely upon other medical testimony that Tina's wounds were consistent with a knife or other stabbing instrument, and upon the testimony of cellmate Lee that defendant admitted stabbing Tina with a knife. Similarly, the jury reasonably could infer that, in light of the nature of Tina's injuries and the location of the crime scene (a dead-end road), defendant was already armed before kidnapping her.

With respect to the evidence of motive, defendant argues that *Anderson* requires proof of some "prior relationship" between defendant and his victim. To the contrary, *Anderson* speaks of a "prior relationship and/or *conduct with the victim*" from which a motive could be inferred. (70 Cal.2d at p. 27, italics added.) Here, the relevant "conduct" was Tina's viewing defendant after her blindfold slipped.

Defendant correctly observes that *Alcala, supra,* is factually distinguishable in certain respects. The fact remains, however, that the legal principles we applied in that case are fully applicable here and support the jury's conclusion that defendant committed a deliberate and premeditated murder.

B. *Admissibility of Cellmate Testimony*

Next, defendant contends that cellmate Donald Lee was a police agent/informant who obtained inculpatory statements from defendant in violation of his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination. (Defendant has not challenged the admission of cellmate Hughes's similar testimony.) As will appear, the point lacks merit.

1. *Facts.* Defendant was incarcerated on unrelated criminal charges, and was represented by counsel on those charges. He was also deemed a "prime suspect" in the Salazar murder case, but he had not been charged with that offense. After his arrest, defendant had invoked his right to remain silent and had refused to talk with interrogating officers. Sergeant Dean Hess, in an unsuccessful attempt to obtain more incriminating

information from defendant, monitored defendant's jail conversations, but learned nothing helpful. (The monitoring preceded our decision in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], invalidating such practices.) Hess also attempted to find a suitable inmate to become defendant's cellmate and to report incriminating conversations.

Hess eventually met with inmate Lee, who coincidentally was then sharing a cell with defendant. (Hess had met with Lee on a prior occasion when Lee had discussed an earlier assault upon him by other inmates and had requested protective custody, resulting in sharing a cell with defendant in a maximum security area.) Sergeant Hess and Lee each testified regarding this conversation.

According to Hess, he explained to Lee that he hoped Lee would pass on information regarding defendant's statements, but "he [Lee] was not instructed to do so." Hess advised Lee not to tell defendant that Lee had talked to Hess, who realized that legally he could not directly interrogate defendant nor could he use a "police agent" to initiate such conversations.

Lee elaborated on the conversation with Hess. Lee was not directed to attempt to obtain information from defendant, "but if I heard anything, that I might want to say later on," Lee was asked to inform Hess about it. Hess explained to Lee that he could not lawfully direct Lee to return to the cell and attempt to obtain any "details," because that directive would be illegal. But Hess told Lee that if something "important" came up, Lee should decide whether or not to report it to Hess.

Lee testified that he was never promised any reward or consideration for relating such information. He acknowledged, however, that informants frequently receive protection from assaults by other inmates. Lee himself, upon pleading guilty to an escape charge, received a two-year prison term with protective custody. But no evidence was introduced to show that such custody was granted in consideration of his cooperation with Hess.

Lee eventually informed Sergeant Hess of several conversations with defendant regarding the Salazar killing. Lee explained that his sole motive for relating such information was "to relieve my mind [of] what I heard." Lee testified at defendant's preliminary hearing that, among other things, defendant had admitted killing Tina Salazar with a knife because she had seen his face; defendant also admitted to Lee that he had molested other young girls.

At the preliminary hearing, the magistrate denied defendant's motion to suppress Lee's testimony, finding that Lee was not a paid informant, that

Lee was placed in defendant's cell accidentally, that Lee asked no questions of defendant nor "forced" any information from him, and that Lee's cooperation was given "for his own conscious [conscience] sake" and was not induced "for any reason of police action." The magistrate further found that Lee was "unsophisticated," "direct," and "honest in his answers."

Lee disappeared following the preliminary hearing and was unavailable at trial. Accordingly, the prosecution was permitted to read Lee's preliminary examination testimony into the record.

2. *No Sixth Amendment violation.* A fair reading of the record indicates that, although Lee was not directed to initiate possible incriminating conversations with defendant, Lee was asked to listen to defendant's words and report to Hess any incriminating statements volunteered by defendant. Defendant contends that, accordingly, Lee was a police agent whose activities violated defendant's right to counsel and his privilege against self-incrimination. We disagree.

The leading case regarding cellmate testimony is *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183], wherein a paid inmate-informant (Nichols) provided the government with information regarding defendant Henry's incriminating statements. As in the present case, the informant was told not to question defendant, but if defendant initiated any conversations, the informant was asked to pay attention to them. (P. 268 [65 L.Ed.2d at pp. 120-121].) Unlike the present case, however, the informant in *Henry* was not a mere "passive listener" or "listening post," but instead made efforts to "stimulate" conversations with defendant, his cellmate. (See pp. 271 & fn. 9, 273 [65 L.Ed.2d at pp. 122-124].) Nichols's motive in eliciting incriminating responses from defendant Henry was heightened by a "contingent-fee" arrangement whereby the informant would be paid "only if he produced useful information." (P. 270 [65 L.Ed.2d at p. 122].)

The *Henry* court stated the Sixth Amendment issue was "whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah* [v. *United States* (1964) 377 U.S. 201 (12 L.Ed.2d 246, 84 S.Ct. 1199), proscribing post-indictment monitoring of defendant's statements]. Three factors are important. First, Nichols was acting under instructions as a paid informant for the government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols." (P. 270 [65 L.Ed.2d at p. 122].) The court concluded that "By intentionally creating a situation likely to induce Henry to make incriminating statements without the

assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (P. 274, fn. omitted [65 L.Ed.2d at p. 125].)

After *Henry* was decided, the high court reiterated its principles in *Maine v. Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], additionally holding that incriminating evidence concerning an existing, charged offense, obtained by a secret police informant while investigating an uncharged offense, was inadmissible at the trial of the charged offense. In the present case, as discussed below, the evidence at issue pertained to, and was admitted as proof of, the Salazar murder of which defendant had not been charged when the evidence was obtained. *Moulton* is thus distinguishable.

Following *Moulton,* the court decided *Kuhlmann v. Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364 [106 S.Ct. 2616], holding that *Henry's* principles did not apply where the police informant/cellmate merely listened to and reported the accused's incriminating statements, without engaging in questioning or other activity designed deliberately to elicit incriminating statements. In *Kuhlmann,* the prisoner previously had agreed with police to act as an informant, and had thereafter reported the accused's "spontaneous" and "unsolicited" incriminating statements to the police. The high court concluded that in order to make out a Sixth Amendment violation under *Henry* or *Moulton,* "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (Id., at p. 436 [91 L.Ed.2d at pp. 384-385, 106 S.Ct. at p. 2630].)

Our court recently considered the scope of the *Henry* decision in *People v. Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], a case which preceded *Kuhlmann.* There, we stressed the importance of determining whether the state has *created* a situation likely to produce incriminating statements; in that regard we indicated that the state cannot avoid *Henry's* proscriptions merely by advising the informant to "listen but don't ask." (*Id.,* at pp. 741-742.) On the other hand, we also observed that *Henry* is inapplicable to an informant who truly "acts on his own initiative" rather than on orders by the state. (Pp. 742-743.)

Since in *Whitt* the investigating officer had no prior dealings with deLoach, the informant, who initially volunteered to relate the incriminating statements made by Whitt, *Henry* was deemed inapplicable even though the officer *continued* to accept deLoach's information after promising to talk to the prosecutor about deLoach's own sentence. (P. 744.) We observed that the foregoing promise was not conditioned upon the informant's continued assistance in providing such information, and that indeed no promise of leniency was obtained from the prosecutor. "Thus, on these close facts it

cannot be found that the police gave deLoach the incentive to obtain information from Whitt after July 8th, to such an extent that deLoach's conduct is attributable to the state." (*Ibid.*)

Applying the principles of the foregoing cases, we conclude that the trial court properly denied defendant's motion to suppress cellmate Lee's testimony.

First, the information procured by Lee related to an offense other than the offense with which defendant had been charged. Defendant was originally arrested and confined in jail on an unrelated matter; no formal charges had yet been filed against him regarding the Salazar murder. ██ Although he was indeed a suspect in that murder, the prophylactic rules set forth in *Massiah* and *Henry* apply only to the attempt to gather incriminating information regarding the formal charges, because the defendant has a present right to counsel only as to those charges. As stated in *Maine* v. *Moulton, supra,* "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." (474 U.S. at p. 180, fn. 16 [88 L.Ed.2d at p. 499].)

In the present case, defendant was evidently represented by counsel with respect to the charged offense for which he had been incarcerated. Cellmate Lee's conversations, however, did not involve that offense, and defendant cites no case suggesting that once an accused has obtained counsel with respect to one offense, all further interrogation must cease regarding other possible offenses.

Second, even were we to hold that defendant's Sixth Amendment right had attached as to *both* offenses, we would still conclude that no violation of that right occurred here. The magistrate expressly found that Lee asked no questions of defendant nor "forced" any information from him. That being so, *Kuhlmann* v. *Wilson, supra,* applies and defendant's volunteered statements to cellmate Lee were admissible because they were not deliberately elicited by a police agent.

For the foregoing reasons, we conclude that defendant's Sixth Amendment claim under *Henry* must be rejected.

3. *No Fifth Amendment violation.* ██ For similar reasons, we reject defendant's Fifth Amendment claim under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. In light of the principles expressed in *Moulton* and *Kuhlmann, supra,* cellmate Lee had no

obligation to advise defendant of his constitutional rights prior to engaging in conversations with him. (See *People* v. *Whitt, supra*, 36 Cal.3d at p. 745.)

4. *The prosecution exercised due diligence.* ▮ Defendant also objected to the use of Lee's preliminary hearing testimony on the ground that the People failed to demonstrate due diligence in locating Lee and securing his testimony at trial. A witness's prior testimony may be introduced if, among other things, he is unavailable as a witness at trial. (Evid. Code, § 1291.) "Unavailability may be established by showing that the declarant is 'Absent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process.' ([Evid. Code] at § 240, subd. (a)(5).)" (*People* v. *Jackson* (1980) 28 Cal.3d 264, 311-312 [168 Cal.Rptr. 603, 618 P.2d 149].) The prosecution must make a good faith effort and exercise reasonable diligence to procure the witness's appearance. (*Id.*, at p. 312; see also *Ohio* v. *Roberts* (1980) 448 U.S. 56, 62-77 [65 L.Ed.2d 597, 605-615, 100 S.Ct. 2531] ["good faith efforts" involve taking "reasonable" steps to locate an absent witness, but do not include pursuing futile acts not likely to produce the witness for trial].)

In the present case, Lee testified at the preliminary hearing in March and April 1979. Trial, however, did not commence until September 1981, a delay in part attributable to pretrial proceedings culminating in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. By that time, Lee had become unavailable and, accordingly, the People moved to use his preliminary hearing testimony. The trial court conducted an extensive hearing aimed at determining whether the People exercised due diligence in attempting to procure Lee as a trial witness. The court concluded that due diligence was shown, a finding supported by substantial evidence.

Thus, the record discloses that, at some point during the two-and-one-half-year interval between the preliminary hearing and the trial, Lee's whereabouts became unknown. More than one month before Lee's trial testimony was needed, investigators from the district attorney's office attempted to locate him. Learning that Lee had been released on "interstate parole" to Oklahoma authorities, the investigators made further inquiries and learned that Lee's Oklahoma parole had terminated and that Oklahoma authorities were unaware of Lee's present location. Attempts to locate or call Lee's parents and in-laws were unsuccessful. Records from the Oklahoma police and Federal Bureau of Investigation were consulted to no avail. The Oklahoma officers cooperated in attempting to find Lee by following numerous leads, making various telephone calls and checking arrest and drivers' license records. The People's investigators made, by defendant's

own count, approximately 17 telephone calls to various sources in a vain attempt to uncover Lee's whereabouts. This number does not include additional calls by local authorities in Oklahoma.

On hearing the foregoing evidence regarding the prosecution's efforts to locate Lee, the trial court indicated that it would allow Lee's preliminary hearing testimony unless the defense could convince the court to disallow it. ("I'm inclined to think the burden kind of is with you, Mr. Trudell, to show me why I shouldn't allow the testimony.")[3] Defense counsel then testified that at one point the district attorney had informed him that the People had located Lee, a remark which assertedly induced defense counsel to terminate his efforts to find Lee. The district attorney, however, testified in response that he simply told counsel he was "hopeful" of locating Lee. Following additional argument by counsel, the trial court granted the People's motion to read Lee's preliminary hearing testimony into the record, expressly finding that the People had exercised due diligence in attempting to locate Lee. The court, learning that defense counsel likewise had not been in contact with Lee at any time during the period in question, also denied defendant's motion for a continuance for the purpose of attempting to find Lee.

Defendant now argues that the People's efforts failed to reflect due diligence. He contends that the People should have either attempted to subpoena Lee while he was still in this state, or pursued other investigative leads, including Lee's "employers or state agencies that might be his means of support," and "state mental hospitals" where Lee, previously hospitalized for treatment, might be confined. (Defendant does not assert that pursuing those inquiries would have been successful.) Defendant argues that at least the People should have kept in "periodic contact" with Lee as soon as he was released from prison in California.

■ We have held that the question of due diligence is a factual one depending on the circumstances in each case, and that the trial court's determination of the issue will not be disturbed in the absence of a showing of an abuse of discretion. (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73]; see *People* v. *Jackson, supra,* 28 Cal.3d at pp. 311-312.) In *People* v. *Louis* (1986) 42 Cal.3d 969, 984-989 [232 Cal.Rptr. 110, 728 P.2d 180], we suggested (but did not decide) that an appellate court should independently review the record on the due diligence issue. ■ In any event, in the present case, whether the "abuse of

---

[3] Although defendant now contends that the trial court's remarks improperly "shifted the burden of proof" on the due diligence issue to defendant, read in context we think the trial court was merely calling upon defendant to respond to the People's substantial showing of due diligence.

discretion" or the "independent review" test is used, the trial court's finding of due diligence should be upheld.

First, we could not properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear," long before a trial date is set. Certainly, resort to the subpoena or "material witness" processes would have been premature in this case.

In *Louis, supra,* we held that if a particular witness's testimony is deemed "critical" or "vital" to the prosecution's case, the People must take reasonable precautions to prevent the witness from disappearing. (42 Cal.3d at pp. 989-991.) There, the People honored witness Tolbert's own request for an "own recognizance" release on theft charges, knowing of a substantial risk that this important witness would flee. Because the People failed to take adequate preventative measures, such as holding Tolbert as a material witness pending defendant Louis's trial, no due diligence was shown. (*Id.,* at pp. 992-993, fn. 8.) In the present case, unlike *Louis,* witness Lee's probable trial testimony would not have been so "vital" to the prosecution's case, because it was largely cumulative of cellmate Hughes's testimony.

More important, due process principles obviously would not have permitted holding Lee as a material witness during the two-and-one-half-year period that elapsed following his preliminary examination testimony. (The material witness provisions of the Penal Code are limited to requiring a bond to secure the witness's appearance, and a maximum *10 days* in custody for failure to post such a bond. See also Cal. Const., art. I, § 10, forbidding the unreasonable detention of witnesses.)

We conclude that the trial court's ruling should be sustained. ■ We similarly reject defendant's related argument that even if due diligence were shown, the admission of preliminary examination testimony of "inherently unreliable" cellmate testimony violates constitutional confrontation rights where the cellmate declarant becomes unavailable to testify at trial. Our prior cases make clear that (1) cellmate testimony is not inherently unreliable (see *People* v. *Alcala, supra,* 36 Cal.3d at pp. 623-624), and (2) a criminal defendant's constitutional confrontation right is not absolute, and is not infringed by use of his prior testimony where the declarant is unavailable at trial and his prior testimony was subject to cross-examination by the defendant (*People* v. *Enriquez, supra,* 19 Cal.3d at p. 235).

C. *Exclusion of Evidence Regarding Police Efforts to Find Other Informants*

The trial court refused to permit defendant to introduce testimony, elicited at the preliminary examination, regarding attempts by Sergeant Hess to find other informants who would report defendant's incriminating statements. At trial, the prosecutor objected to such testimony as irrelevant and it was excluded. ▮ Defendant now contends that such evidence would have helped impeach the incriminating testimony of informants Lee and Hughes, permitting the jury to infer from Hess's "intense desire" for such testimony that it would be "worth their while to create the testimony that Hess wanted."

The jury learned from Hess that he "absolutely" tried every possible way to secure a conviction of defendant for Tina's murder. The fact that Hess attempted to contact other informants before finding Lee and Hughes would have added very little to the defense's attempts to impeach those witnesses. The trial court had discretion to exclude evidence of such doubtful relevance and speculative nature.

D. *Failure to Instruct on Distrust of Informants' Testimony*

▮ Defendant next contends that the trial court committed reversible error in failing to instruct sua sponte that the testimony of jailhouse informants should be viewed with distrust. We rejected a similar argument in *People v. Alcala, supra,* 36 Cal.3d at pp. 623-624, holding that the testimony of an informant need not be corroborated, thereby rejecting the argument that an informant is analogous to an accomplice, and is equally likely to give false or biased testimony. We observed that, but for certain specified testimony, "an interested witness' 'entitle[ment] to full credit' under [Evidence Code] section 411 is a matter for the trier of fact. [Citations.] . . . The exception for accomplice testimony . . . arises from the accomplice's overwhelming motive to shift blame to defendant. . . . Whatever consideration a jailhouse informant may expect for testifying, the direct, compelling motive to lie is absent." (*Ibid.*)

No California case has imposed a sua sponte duty to give cautionary instructions as to the testimony of an informant. Two decisions have discussed whether such an instruction should be given *on defendant's request.* (*People v. Castro* (1979) 99 Cal.App.3d 191 [160 Cal.Rptr. 156]; *People v. Barnett* (1976) 54 Cal.App.3d 1046 [127 Cal.Rptr. 88].) Both cases held that the trial court's rejection of the proffered instruction was at most harmless error, as the informant's testimony was not the sole basis for the conviction (*Castro*) or was amply corroborated (*Barnett*).

Similarly, all but one of the federal cases which discuss the point involved instructions *requested by the defendant.* (See *United States* v. *Patterson* (9th Cir. 1981) 648 F.2d 625; *Guam* v. *Dela Rosa* (9th Cir. 1981) 644 F.2d 1257; *United States* v. *Swiderski* (2d Cir. 1976) 539 F.2d 854; *United States* v. *Kinnard* (1972) 150 App.D.C. [465 F.2d 566]; *Fletcher* v. *United States* (1946) 81 App.D.C. [158 F.2d 321]; but see *United States* v. *Garcia* (5th Cir. 1976) 528 F.2d 580 [reversal where conviction based entirely on informer's uncorroborated testimony].)

Based on the *Alcala* rationale previously discussed, and the paucity of authority supporting defendant's position, we conclude that the trial judge had no duty to give sua sponte cautionary instructions regarding an informant's testimony.

### E. *Validity of Stipulation Admitting Identity*

For purposes of establishing defendant's identity as the kidnapper and killer of Tina Salazar, the People were prepared to introduce evidence of defendant's conviction of an offense involving the kidnapping in Albany of Michele G., a nine-year-old girl, occurring shortly after the Salazar incident. After receiving an unfavorable ruling from the trial court upholding the limited admissibility of the foregoing offense, defendant and his counsel agreed to stipulate to the issue of identity in order to foreclose the People from introducing at the guilt phase potentially prejudicial evidence regarding the Albany offense.

The stipulation read as follows: "I, Richard Adams Hovey, acknowledge taking possession of Tina Salazar against her will and driving her from the neighborhood. [¶] I, Richard Adams Hovey, acknowledge doing the act which caused injuries which ultimately lead [*sic*] to the death of Tina Salazar."

Before accepting the stipulation, the trial court extensively examined defendant and his counsel regarding the scope and effect of the admissions contained therein, observing that although it would preclude the People from introducing any similar offenses, such as the Michele G. conviction, during the guilt phase of the trial, the stipulation also would "incriminate" defendant in "two very serious crimes (i.e., murder and kidnapping)," and would conclusively establish the issue of identity. The trial judge determined that defendant both understood the nature of the stipulation and realized that he was waiving certain constitutional rights by agreeing to its contents, including the right against self-incrimination, the right to a jury determination of the identity issue, and the right to confront witnesses on

that issue. Defendant explained that "My lawyer has advised me that it's a good course to follow and I agree with it."

Defendant now contends that the court failed adequately to explain to him the potential "penal consequences" of the stipulation, namely, that he "was in effect admitting to second degree murder," which would justify imposition of a prison term. We have held that before a defendant may admit a prior conviction (*In re Yurko* (1974) 10 Cal.3d 857, 864 [112 Cal.Rptr. 513, 519 P.2d 561]), submit a case on the preliminary hearing transcript (*Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 604 [119 Cal.Rptr. 302, 531 P.2d 1086]), or stipulate to ex-felon status (*People* v. *Hall* (1980) 28 Cal.3d 143, 157, fn. 9 [167 Cal.Rptr. 844, 616 P.2d 826]), the court should assure that the defendant is aware of the nature and consequences of his actions. (See also *In re Birch* (1973) 10 Cal.3d 314, 321-322 [110 Cal.Rptr. 212, 515 P.2d 12] [guilty plea invalid where defendant not advised of sex registration requirement accompanying conviction].)

We reject defendant's argument. First, his stipulation was not the legal equivalent of a guilty plea or other admission which necessarily would have definite penal consequences. The stipulation admitted his identity as the offender, but did not purport to deprive defendant of any affirmative defenses he might have, such as diminished capacity, insanity, lack of premeditation, deliberation or malice, killing upon provocation or heat of passion, or even an accidental killing. Although the stipulation came close to admitting that a felony-murder took place (a killing during the commission of a kidnapping), it was probably legally insufficient by itself to establish each of the technical legal requirements for either the offense of kidnapping or murder. At most, the stipulation relieved the prosecution of the burden of establishing that defendant was the person who abducted and killed Tina Salazar. The People were still required to prove (and in fact did prove) the essential legal elements of the various offenses with which defendant was charged.

Defendant states that "Even if appellant's stipulation was not technically an admission of second degree murder, it was certainly an admission of conduct subjecting him to serious criminal liability, and it required a knowing and voluntary waiver." We think that the trial court adequately advised defendant of the consequences of the stipulation by telling him that "you will be incriminating yourself in two very serious crimes and lessening the burden of the district attorney of proving those particular elements." Defendant's response, "I understand," undoubtedly included a realization that, having admitted taking and killing Tina, he faced a probable prison sentence (and possible death sentence). We decline to hold that the trial court in a capital case commits reversible error by failing to tell the

defendant that his admission of committing a kidnapping and homicide might have serious penal consequences.

 In a supplemental brief, defendant raises the further contention that the stipulation was void because it was induced by the trial court's erroneous ruling that evidence of defendant's commission of a similar offense (the kidnapping of Michele G. in Albany) would be admissible for the limited issue of identity. The contention is without merit.

First, although the parties have not cited pertinent authority, it is arguable that defendant waived the right to attack his stipulation on this basis, having voluntarily accepted it without attempting to reserve the right subsequently to challenge it as the tainted product of the trial court's erroneous ruling regarding the admissibility of the Michele G. evidence.

 In a closely analogous situation, we have ruled that if a defendant wishes to preserve for appeal his claim of improper impeachment by a prior conviction, he must take the stand and actually suffer such impeachment. (*People* v. *Collins* (1986) 42 Cal.3d 378, 383-388 [228 Cal.Rptr. 899, 722 P.2d 173]; see *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460].) Here, rather than testify subject to such impeachment, defendant chose to stipulate to his identity as Tina's assailant.[4] His decision to do so arguably waived his right to raise the admissibility issue on appeal.

On the merits, a close question is presented whether the trial court abused its discretion in ruling that evidence of the Michele G. incident would be admissible on the issue of identity. The People acknowledge that such "other crimes" evidence is admissible only where there exist "common marks which, considered singly or in combination, support the strong inference that the current crime bears [defendant's] signature." (*People* v. *Alcala, supra*, 36 Cal.3d at p. 632.) But the People point to 23 common marks which they claim support the trial court's ruling. The areas of similarity include the fact that both incidents occurred in Alameda County; both victims were Caucasian female children between the ages of eight and nine; both victims were walking home alone near a public school in their own neighborhood when abducted from the sidewalk and dragged into their assailant's car; both victims were tied hand and foot and their heads covered by a piece of cloth to hide their eyes; both victims' hands were tied in *front*

---

[4] The record indicates that although the stipulation appears to have been induced by reason of the trial court's evidentiary ruling, defendant personally signed it both to place himself "in a better position before the jury," and "it [the stipulation] helps the—you know, it costs the people of Alameda County a lot of people [*sic*] to pay for all this and I'm willing to consider that too."

of their bodies; both victims were driven from a public street to a more secluded area and, after being observed by third persons, both victims were thrown from the car with their hands and feet still bound. Finally, although the kidnapper did not remove his victims' clothes, some evidence was admitted indicating that he molested each girl. (Michele G. testified that defendant forced her to hold his penis; cellmate Donald Lee reported that defendant admitted "playing" with Tina Salazar and "feeling her body.")

On the other hand, defendant correctly observes that several of these "common marks" are likewise "common to a substantial portion of the population of child molesters." (*Alcala, supra,* 36 Cal.3d at p. 633.) Many child abductors who commit violent sex crimes against children attempt to conceal their identities and control their victims by blindfolding and binding them. If such an assailant is observed while his victim remains in the vehicle, it is logical to expect him to eject the still bound victim and attempt to escape. In addition, the two crimes bore some substantial *dissimilarities,* such as the materials used to bind the victims' hands, and the fact that Michele G. was released unharmed.

Thus, the question whether the trial court abused its discretion in ruling the Michele G. incident admissible is close. We conclude, however, that under the circumstances here any possible error in that ruling was harmless. In addition to defendant's stipulation, defendant's identity as Tina's killer was amply established by the other evidence in the case, including the testimony of witnesses Anderson and Irons and defendant's cellmates Lee and Hughes.

### F. *Testimony of Officer Romero*

Officer Romero, who arrested defendant in June 1978 (presumably for kidnapping Michele G.), testified, over objection, that immediately following his arrest defendant "asked me what incident this was about . . . . He asked me, you know, what it was about: the details of—why the arrest." Romero replied that another officer would be discussing the matter at the police station. Later in his testimony, Romero repeated that when first arrested, defendant said: "Which one is this about?"

Defendant now suggests that Romero's reference to defendant's uncertainty regarding which charge the arrest was based on was an "outrageous violation" of the stipulation to exclude testimony regarding the Michele G. kidnapping. According to defendant, "The prosecution's calling Romero and deliberately eliciting this reference to the [Michele G.] crime was indefensible." The point lacks merit—Romero's brief references to defendant's ambiguous comment could not possibly have led the jury to conclude that

defendant had committed, or was acknowledging his commission of, another kidnapping.

### G. *Validity of Booking Search*

Prior to trial, defendant moved to suppress certain incriminating evidence (defendant's ownership and sale of the kidnap vehicle) based on asserted illegality by the police following defendant's arrest. Defendant, arrested on an unrelated charge, was taken to the Hayward jail and an inventory was conducted of his belongings, including the contents of his wallet. The booking officer listed, among other items, a wrecking company's receipt for a 1961 Ford car.

Defendant's property was placed in a locker where other inmates' property was stored. Thereafter, defendant was transferred to the Albany jail where, on booking, an Albany officer reinventoried defendant's property. The various papers in defendant's possession were examined by Sergeant Stirling, who was investigating the Albany kidnapping of Michele G., as previously discussed. Stirling, thinking that defendant and his 1961 Ford might match the suspect and vehicle described in the Salazar murder case, contacted Sergeant Hess of the Alameda Sheriff's Department, who was the investigating officer in that case. Shortly thereafter, witness Irons was brought to the wrecking company where he identified the 1961 Ford as the Salazar kidnap vehicle.

 Defendant first contends that the officers exceeded the permissible scope of a routine warrantless booking search when they examined the papers contained in defendant's wallet. Defendant argues that jail security and other legitimate concerns can be adequately maintained by simply storing closed containers such as wallets, rather than opening and "probing" their contents.

The United States Supreme Court recently rejected the argument advanced by defendant here, concluding that inventory searches into closed containers are constitutionally permissible if conducted as part of the booking process. (*Illinois* v. *Lafayette* (1983) 462 U.S. 640, 643-648 [77 L.Ed.2d 65, 69-73, 103 S.Ct. 2605].) The high court observed that such a thorough inventory was supported by a "range of governmental interests," including prevention of theft and false claims thereof, and detecting dangerous, concealable items such as drugs or weapons. The court declined to invalidate the search merely because the foregoing ends could have been achieved through less intrusive means. The *Lafayette* court concluded that the officers properly conducted a thorough inspection of the suspect's shoulder bag.

We recently adopted *Lafayette's* holding in *People* v. *Miranda* (1987) 44 Cal.3d 57, 80-82 [241 Cal.Rptr. 594, 744 P.2d 1127], wherein we upheld a booking search of an envelope and its contents, found in defendant's pants pocket. Thus, both *Lafayette* and *Miranda* support the warrantless search of defendant's wallet in the present case.

Likewise, we reject defendant's contention that the officers should not have *read* the papers discovered in defendant's wallet, after finding no weapons or contraband. A reasonably complete inventory would include identifying the document seized and, like the letter in *Miranda,* it was necessary to read the car receipt in order to properly identify and inventory it.

Finally, defendant challenges the "second look" at defendant's papers which occurred when defendant was transferred to Albany jail. But we see no compelling reason for holding that, on transfer of a suspect to another facility, a second booking search may not be conducted. There is no indication that the transfer was made for purposes of conducting an additional search of defendant's papers.

### H. *Admission of Photograph of Victim*

Defendant next contends that the trial court committed prejudicial error in admitting during the guilt phase a large photograph of victim Tina Salazar, taken two months before she was murdered. Defendant asserts that the sole reason this "charming" photo was admitted was to gain sympathy for Tina, an irrelevant concern during the guilt phase. (See *People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [180 Cal.Rptr. 266, 639 P.2d 908].)

The photo was 12 by 14 inches in size and, as defendant acknowledges, it was "just an ordinary head and shoulders portrait." Although admission of a photograph of the victim while alive may be considered error if irrelevant to any contested issue in the case, any error here was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594-595 [238 Cal.Rptr. 66, 737 P.2d 1350]; *People* v. *Allen* (1987) 42 Cal.3d 1222, 1256-1258 [232 Cal.Rptr. 849, 729 P.2d 115].)

Tina's photo, though perhaps "charming," was nonetheless an "ordinary" one not likely to produce a prejudicial impact. As indicated previously, in light of defendant's stipulation and his incriminating statements to his cellmates, this was not a "close" case on the issue of guilt.

### I. *Griffin Error*

Defendant next contends that the prosecutor committed prejudicial misconduct when, during her closing argument, she observed that

although defendant had stipulated to the kidnapping and the killing, "he's never said anything to you about why, why he did these things." Later during the same argument, the prosecutor commented on the evidence regarding defendant's use of a knife to stab his victim, observing that defendant told his cellmate that he used a knife, and that "He's never told you anything different." According to defendant, the foregoing observations amounted to forbidden comments upon defendant's failure to testify in his own defense. (See *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People* v. *Vargas* (1973) 9 Cal.3d 470, 475-476 [108 Cal.Rptr. 15, 509 P.2d 959].)

■ As we have stated, "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand. The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citation.]" (*People* v. *Jackson, supra*, 28 Cal.3d at p. 304.) ■ Here, the prosecutor's comments do indeed seem directed to defendant's failure to testify, despite the People's argument that the prosecutor was merely commenting upon the scope of the stipulation and its limited contents. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 757-758 [175 Cal.Rptr. 738, 631 P.2d 446] [*Griffin* error to observe that incriminating evidence was "uncontradicted" by defendant]; *People* v. *Vargas, supra,* 9 Cal.3d at p. 476 [*Griffin* error to observe that defendant failed to "deny" his presence at the crime scene].)

In any event, as we also stated in *Jackson* and *Vargas,* indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error. (*People* v. *Jackson, supra,* 28 Cal.3d at p. 305; *People* v. *Vargas, supra,* 9 Cal.3d at pp. 478-481.) We believe the prosecutor's remarks in this case fall within that category, especially since she was purportedly addressing the contents of the stipulation, which itself constituted a limited waiver of defendant's self-incrimination rights, a matter upon which she was permitted to comment. The very fact that the stipulation was admitted at trial focused the jury's attention upon the fact that defendant had declined to testify directly regarding the offenses. Accordingly, any *Griffin* error was harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### J. *Exclusion of Prospective Jurors*

Defendant contends that various prospective jurors were improperly excluded from the guilt or penalty phases of his trial. These various

contentions each have been rejected by us in recent decisions and need not be reconsidered here. (See *People* v. *Frank* (1985) 38 Cal.3d 711, 734 [214 Cal.Rptr. 801, 700 P.2d 415]; *People* v. *Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680].)

In addition, defendant argues that various prospective jurors were improperly excluded from the penalty phase in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. We consider that argument below in connection with our review of the other penalty phase issues.

### K. *Exclusion of Defendant From Competency of Counsel Hearing*

During the guilt phase, the trial court held a hearing in chambers to determine whether defendant's principal trial attorney, Paul Trudell, was continuing to provide effective assistance. Defendant was not personally present during the hearing.

The hearing was commenced after Attorney Trudell indicated he was unprepared to discuss the reading of Donald Lee's preliminary examination transcript to the jury. Observing that Trudell had professed similar unpreparedness on prior occasions, the court deemed it necessary to explore further counsel's competency. After hearing from various members of the public defender's office and associates of Trudell, the court found counsel "both factually and legally and by experience and by training to be at all times" competent to represent defendant. Although defendant was not present, both counsel Trudell and assistant counsel Harpham agreed to discuss the matter of Trudell's continued representation with him and report back to the court in the event that defendant had any questions about Trudell's competence or any desire to change attorneys. Evidently, defendant expressed no such reservations regarding counsel's representation, and the matter was dropped.

We conclude that defendant was properly excluded from the competency hearing, for it is very doubtful as a matter of sound public policy that a criminal defendant's presence should be required at in-chambers inquiries regarding his counsel's competence, unless the defendant himself has initiated the inquiry. Attendance at such hearings could well undermine the confidence and cooperation so necessary to insure an effective representation.

As a general rule, the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his

opportunity to defend the charges against him, and "[t]he burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial." (*People* v. *Jackson, supra,* 28 Cal.3d 264, 309-310; see *United States* v. *Gagnon* (1985) 470 U.S. 522 [84 L.Ed.2d 486, 105 S.Ct. 1482]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-361 [215 Cal.Rptr. 1, 700 P.2d 782].) Here, nothing was disclosed at the chambers conference which might have led defendant to seek new counsel—Trudell merely explained that he was unprepared to discuss in depth ("line-by-line") the transcript at issue, and thereafter various witnesses *confirmed* his skill and competence. If defendant had any misgivings regarding his counsel, he could have raised them with his counsel or cocounsel when, as previously agreed, they privately approached him concerning the matter. We conclude that the trial court's handling of the issue was an appropriate alternative to involving defendant personally in a proceeding which might well have weakened or destroyed the attorney-client relationship.

### III. CONTENTIONS AFFECTING PENALTY PHASE

#### A. *Exclusion of Prospective Jurors*

 Defendant contends that five prospective jurors were improperly excluded by reason of their adverse views regarding the death penalty. According to defendant, these prospective jurors failed to make it unmistakably clear that they would automatically vote against the death penalty without regard to the evidence produced at trial. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785]; *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, 10-11.)

The review standard cited by defendant has been substantially modified by the United States Supreme Court in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], a modification recently adopted by our court in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250]. *Witt* adopted a new review standard, namely, whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." In addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this new standard likewise does not require that a juror's bias be proved with "unmistakable clarity." (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].)

Because we believed that *Witt's* review standard and underlying rationale made good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopted the *Witt* standard in *Ghent.* As will

appear, however, even under the stricter *Witherspoon* test, none of the prospective jurors was improperly excused for cause in the present case.

Our review of the record discloses that although several such jurors made somewhat equivocal responses to the *Witherspoon* inquiry, each of them at one point confirmed that he or she could not vote for death under any circumstances. For example, in the present case prospective juror Risher at one point stated that she could "see" herself voting for the death penalty, but she later explained that given the alternative of life imprisonment without parole, she would never vote for death. Prospective juror Lopez first replied that he "didn't know" whether he could vote for death, but subsequently explained that he could not do so under any circumstances. Similar responses were elicited from prospective jurors Herce, Williams and Johnson. All these prospective jurors were properly excused for cause.

Defendant additionally argues that each of the foregoing challenges for cause were improper because the trial court failed to inform the prospective jurors of their duty to subordinate their personal views regarding the death penalty and to obey the laws of this state. We rejected that argument in *People* v. *Ghent, supra*, 43 Cal.3d at pages 768-769.

## B. *Admissibility of Evidence*

Defendant contends that three items of evidence were erroneously admitted at the penalty phase. We find no prejudicial error.

1. *The pornographic magazine.* ■ After defendant presented numerous witnesses attesting to his character and background, the prosecutor (1) introduced, on rebuttal, evidence that defendant read pornographic magazines, and (2) offered into evidence over defendant's objection a magazine found in his bedroom. The magazine, Sweet Virgins, featured apparently young girls in pornographic poses. The trial court admitted the magazine. Defendant contends the court abused its discretion in doing so. (See Evid. Code, § 352.)

Under the 1977 death penalty law applicable to this case, evidence of defendant's character was admissible even if it did not relate to any specific mitigating or aggravating factor. (*People* v. *Murtishaw, supra*, 29 Cal.3d at p. 773; see *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113] [rebuttal evidence]; *People* v. *Boyd* (1985) 38 Cal.3d 762, 772, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) Here, the prosecutor offered the magazine in an attempt to rebut or balance the image of defendant presented by defense witnesses of a studious, artistic intellectual. In our

view, trial courts should exercise great caution before admitting evidence of a defendant's private reading material, especially where the relevance of such material to the issues in the case is slight. Nonetheless, as we stated recently, "The scope of admissible evidence as to the defendant's character and background must . . . be very broad" in capital cases, in light of the nature of the jury's penalty decision. (*People* v. *Harris* (1984) 36 Cal.3d 36, 68 [201 Cal.Rptr. 782, 679 P.2d 433].) We conclude that no abuse of discretion is shown here.

2. *The autopsy protocol.* ▆▆▆ The People also admitted over objection an autopsy report which, in dry, technical jargon, described victim Salazar's various wounds and injuries, and the surgical procedures performed before and after her death. The trial court previously had excluded the protocol from the guilt phase as largely irrelevant, but the court admitted it at the penalty phase as relevant to the manner in which defendant killed his victim. We have held that similar penalty phase evidence is admissible in the court's discretion for the purpose of showing the degree of violence involved, because such evidence bears on the aggravation of the crime and the penalty issue. (*People* v. *Fields, supra*, 35 Cal.3d at pp. 372-373 [gruesome photo of victim].) No abuse of discretion appears here.

3. *The victim's photograph.* As previously discussed, the court admitted a large "portrait" photograph of victim Salazar at the guilt phase. According to defendant, the prosecutor continued to refer to and use the photograph during the penalty phase arguments, in an attempt to gain sympathy for the victim and her family. ▆▆▆▆ We have held that some appeals to sympathy are proper at the penalty phase where the jury must "weigh the sympathetic elements of defendant's background against those that may offend the conscience," so long as no wholly irrelevant information or inflammatory rhetoric is employed. (*People* v. *Haskett* (1981) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776]; see *People* v. *Fields, supra*, 35 Cal.3d at p. 362, fn. 14.) ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ Although trial courts should discourage use of the victim's photograph solely to invoke a sympathetic reaction at the penalty phase, any error here was clearly harmless and could not have affected the verdict.[5]

---

[5]Defendant in a supplemental brief suggests that the trial court failed to comply with section 352 of the Evidence Code when it admitted the various items of evidence discussed above without *expressly* finding that their relevance outweighed their prejudicial effect. (See *People* v. *Frank, supra*, 38 Cal.3d at pp. 731-732.) Our review of the record indicates that any error in this regard was harmless, as in *Frank,* since the trial court was well aware of defendant's objections on the ground of potential prejudice, and a weighing of probative value with the possibility of such prejudice obviously was undertaken in each instance. (See *id.,* at p. 732.) Indeed, with respect to the autopsy protocol, the trial court expressly indicated that defendant's objection "based on prejudice" was overruled.

We observe that the prosecutor, during her penalty phase arguments, referred to the impact of Tina's death upon her parents, a subject arguably inappropriate under the recent decision in *Booth* v. *Maryland* (1987) 482 U.S. __ [96 L.Ed.2d 440, 107 S.Ct. 2529], barring testimony or statements from a victim's family regarding the impact upon them arising from the victim's death.

Thus, the prosecutor stated "Who else is the victim in this case? The parent of that child. I would suspect that not one of you on this jury has not at one time or another had the occasion to find some small child . . . to be missing. [¶] Think a minute when you don't find the child . . . . Think that the next time you see that child she's in the hospital and she doesn't talk to you and she never talks to you again. [¶] Perhaps the ultimate horror in this crime, the comparison . . . between the way defendant in this case treated these children, did not care about them, was concerned for himself, his safety, unconcerned about them, about Tina, about Michelle. . . . [¶] It's that that makes this crime the most horrible of all horrible crimes. The brutal, unconsidering, vicious act of the defendant. Compared with the love that the family has for these—these little girls."

Unlike *Booth,* where the jury was given lengthy, detailed statements from family members regarding the *actual impact* of the victim's death upon their lives, here the prosecutor's remarks were confined to matters already obvious to any juror. Accordingly, the *Booth* decision is "patently distinguishable." (*People* v. *Miranda, supra,* 44 Cal.3d 57, 113.) Moreover, these remarks did not focus on the effect on the family but instead simply distinguished defendant's treatment of his victims from the treatment they received from their loving families. Accordingly, assuming *Booth* would apply to prosecutorial argument of this kind, we conclude that the error was harmless beyond a reasonable doubt.

C. *Admissibility of Subsequent Crime*

As previously indicated, the prosecutor at the penalty phase was permitted, over objection, to present evidence that defendant had committed a forcible kidnapping of a young girl in Albany and had been convicted of that offense. ■■■ Because the crime occurred three months *after* the Salazar murder, defendant now contends that the evidence of the Albany kidnapping was inadmissible because it did not involve a "prior" offense. The point lacks merit.

Under the 1977 death penalty law applicable here, the People were permitted to present evidence "as to any matter relevant to aggravation, mitigation, and sentence, including . . . the presence or absence of *other*

*criminal activity* by the defendant which involved the use or attempted use of force or violence . . . ." (Former § 190.3, italics added.) The same section provided that, in deciding penalty, the trier of fact shall take into account "(b) The presence or absence of [forceful or violent] criminal activity by the defendant . . ." Neither of these provisions was limited to "prior" criminal activity.

The section also contained, however, two further references to the subject. One unnumbered paragraph of former section 190.3 excluded evidence of "other criminal activity" which did not involve force or violence, while another paragraph excluded evidence of "*prior* criminal activity" (italics added) for an offense of which defendant was *acquitted*. Neither of these latter two paragraphs is applicable here, and we find no legislative intent to limit the penalty phase evidence to forceful or violent criminal activity which preceded the charged offense. In light of the penalty jury's role, it would be anomalous to exclude from its consideration highly relevant evidence regarding the defendant's violent character and background. (See *People* v. *Bentley* (1962) 58 Cal.2d 458, 460 [24 Cal.Rptr. 685, 374 P.2d 645] [subsequent crime admissible at penalty phase].)

*People* v. *Balderas* (1985) 41 Cal.3d 144, 201-204 [222 Cal.Rptr. 184, 711 P.2d 480], supports our conclusion. There, we construed the language of the 1978 death penalty law, permitting consideration of the defendant's violent or nonviolent "*prior* felony convictions" (italics added) as limited to nonviolent convictions entered before the charged offense was committed. Significantly, we observed that as to *violent* crimes, "Subdivision (b) [of § 190.3] allows in *all* evidence of *violent* criminality to show defendant's propensity for violence." (P. 202, italics in original.) We so stated despite the fact that other language in section 190.3 provided (in language identical to the 1977 law discussed above) that no evidence of "prior" criminal activity shall be admitted for an offense of which defendant was acquitted. *Balderas* thereby implicitly rejected the present argument that one isolated inclusion of the word "prior" in section 190.3 disclosed an intent generally to limit the admission of evidence of defendant's violent criminal activity. Nor can we think of any sound policy reason for limiting the penalty phase evidence in the manner suggested by defendant.

Similarly, we see no abuse of discretion by the trial court in permitting the People to explore the details of the Albany kidnapping, rather than restricting them to proof of the bare fact of that offense. Defendant now suggests that the trial court should have merely admitted proof of the prior conviction, without "the sordid details," but former section 190.3 contained no such restriction on proof of forcible or violent criminal activity. We conclude that the circumstances surrounding defendant's subsequent

offense were properly admitted. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Harris, supra*, 36 Cal.3d at p. 68; *People* v. *Murtishaw, supra*, 29 Cal.3d at p. 773.)

### D. *Prosecutorial Misconduct*

Defendant next complains of various asserted misconduct by the prosecutor during the course of her jury arguments at the penalty phase. As will appear, no prejudicial misconduct occurred.

■ First, defendant points to repeated statements by the prosecutor that defendant's crime was the "worst possible" or the most "incredibly horrible" crime one might commit. Defendant acknowledges that the prosecutor is entitled to comment on the gravity of the offense in penalty arguments (see *People* v. *Haskett, supra*, 30 Cal.3d at pp. 863-864), but he contends that in the present case the prosecutor went further and "implied a benchmark for comparison that was not in evidence," supposedly based on her experience as a prosecutor. (See *People* v. *Bolton* (1979) 23 Cal.3d 208, 212-213 [152 Cal.Rptr. 141, 589 P.2d 396].) We disagree. The prosecutor's hyperbole suggesting that defendant's crime was the "worst possible" crime one might commit did not purport to be based on any secret information known only to the prosecutor. Moreover, under the circumstances of the present case, the prosecutor's remark constituted a reasonably fair comment on the evidence. We also note that defendant failed to object to the comment or seek an appropriate admonition. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

Next, defendant points to a reference by the prosecutor suggesting that defendant may have shared the same genocidal theories as Adolph Hitler. Thus, the prosecutor stated: "Nothing unusual about this [selective breeding] theory. A lot of people have had it. Hitler, good old Hitler. Hitler wrote poetry. You know, wrote a couple of other things too, and he had some real interesting theories on selective—selection and genetics breeding."

The record indicates that the foregoing remarks were made in response to defense evidence indicating that defendant was a serious student and poet, and referred to extensive prosecution evidence revealing that defendant had expressed strong views on genetic engineering ("selectively breeding for intelligence"), including the necessity of "kill[ing] off the people to begin a new race." Thus, the prosecutor's remarks were not entirely inappropriate or unlinked to the evidence, unlike the cases cited by defendant. (See *United States* v. *Hawkins* (1973) 156 App.D.C. 259 [480 F.2d 1151, 1154] [references to Napoleon, Hitler, Sirhan and others]; *People* v. *Wein* (1958) 50 Cal.2d 383, 396-397 [326 P.2d 457] [comparison to Caryl Chessman im-

proper but harmless error].) We think a case closer on point is *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267], where a prosecutor's comparison of the defendant to the Marquis de Sade was upheld on the basis, in part, that the prosecutor's remark was not inappropriate in view of the evidence in the case, and that the prosecutor "certainly had a right to point out to the jury that modest behavior . . . in the courtroom, is not inconsistent with depraved conduct under other circumstances, and his recourse to history and literature to make this point was not improper under the circumstances."

 In a supplemental brief, defendant complains of the prosecutor's inquiries, on cross-examination of defendant's character witnesses (family members), as to whether or not defendant expressed any remorse for his crime. (The questions were answered with the uniform response that defendant had neither admitted the offense nor discussed it with these witnesses.) According to defendant, this questioning was improper because it focused upon his failure to confess and, accordingly, violated his privilege against self-incrimination. (See *Estelle* v. *Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866]; *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] [questioning regarding defendant's post-arrest silence]; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].)

Although prosecutorial comment or questioning regarding a defendant's silence may be improper in some instances, here the prosecutor's very limited inquiries regarding defendant's expressions of remorse to his relatives were met with unhelpful, negative responses, so any error was clearly harmless. The prosecutor made no effort to draw adverse inferences from defendant's mere silence.

Moreover, as to remorse, we have held that, under a prior death penalty law, the presence or absence of remorse is a factor relevant to the jury's penalty decision. (*People* v. *Coleman, supra,* 71 Cal.2d 1159, 1168.) In addition, we recently observed that "The concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal." (*People* v. *Ghent, supra,* 43 Cal.3d 739, 771.) As in *Ghent,* the prosecutor's questioning herein was relevant in demonstrating the absence of that particular mitigating factor. (Both *Ghent* and the present case were tried under the 1977 death penalty law. In light of possible differences in admissibility standards between the 1977 and 1978 laws [see *People* v. *Boyd, supra,* 38 Cal.3d 762, 772-776], we express no opinion regarding the propriety of such comments under the 1978 death penalty law.)

Finally, defendant contends that the prosecutor committed misconduct when, during arguments regarding the appropriate penalty, she observed that "Laws can change, people can escape and the crime is too awful . . . . [T]he risk is too great and the crime is too awful. No parent should ever, ever have to find their daughter like that." According to defendant, the prosecutor's reference to changing laws and "risks" amounted to comment upon the possibility that a sentence of life imprisonment without parole might be commuted by the Governor. (See *People* v. *Ramos* (1984) 37 Cal.3d 136, 155-158 [180 Cal.Rptr. 266, 639 P.2d 908] [instructing regarding commutation power unconstitutional under state Constitution].)

*Ramos* and its rationale would indeed preclude either court or counsel from advising the jury regarding the Governor's commutation power, and the prosecutor should have avoided any argument which might have diverted the jury's attention to the question whether defendant might some day be paroled. But the prosecutor's statement in the present case was too indefinite and imprecise to have prejudiced defendant. Rather than comment upon the possibility of parole or commutation, the prosecutor merely noted the possibility of an unspecified change in "laws," or an escape from prison. Although these matters likewise were extraneous to the penalty determination (see *Ramos* at pp. 157-159), they were also matters of common knowledge appreciated by every juror who must choose between a death sentence and a sentence of life without parole. The prosecutor's argument herein was far less objectionable than the example cited in *Ramos* of a prosecutor speculating that some future Governor might accept bribes for commuting prison sentences. (*Id.*, at p. 157, fn. 11; see also *People* v. *Davenport* (1985) 41 Cal.3d 247, 287-288 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Ghent, supra*, 43 Cal.3d at pp. 769-770.) We conclude that no prejudicial misconduct occurred here.

E. *"Sympathy" Instructions*

The penalty jury was instructed, in the words of former section 190.3, subdivision (j), that in determining penalty the jury should consider, take into account and be guided by various facts and circumstances, including "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Defendant contends that this instruction was inadequate without additional clarifying instructions (proposed by him, but rejected by the court) which explain the broad scope of the jury's sentencing discretion, including the propriety of

considering such mitigating or "sympathy" factors as the defendant's character and background.[6]

As we held in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], the unadorned language quoted above is potentially confusing because it might be understood by the jury to preclude consideration of a defendant's general character and background evidence. ▉▉▉ Moreover, in *People* v. *Ghent, supra,* 43 Cal.3d 739, 777, we observed that, by reason of a recent opinion of the United States Supreme Court, we must review the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case. (See *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] (conc. opn. by O'Connor, J.), 561 [93 L.Ed.2d at p. 952] (dis. opn. by Brennan, J.), 563 [93 L.Ed.2d at p. 953] (dis. opn. by Blackmun, J.)) ▉▉▉ We have undertaken such a review, and we conclude that there exists "no legitimate basis" (see opn. of O'Connor, J., *id.,* at p. 546 [93 L.Ed.2d at p. 943]) for believing that the jury was misled regarding its sentencing responsibilities.

In the present case, in addition to giving the "catchall" instruction of subdivision (j), the court preceded its penalty phase instructions by telling the jury that "In determining which penalty is to be imposed on the defendant, you shall consider *all of the evidence* which has been received during any part of the trial of the case." (Italics added.) Thus, the jury probably realized that it could consider the extensive testimony regarding defendant's character and background, including testimony from his father, mother, brother, several friends, former classmates, coworkers, and a psychiatrist.

Indeed, both defense counsel and the prosecutor devoted substantial portions of their closing arguments to reviewing and weighing the various character and background evidence that had been admitted at the penalty phase. Thus, the prosecutor, after reviewing the aggravating circumstances for the jury, then stated that "The next question you have to address is the question of mitigation. Is there any way from what you heard or any other factors you can draw upon, *is there any possible way that you can explain, excuse, understand in any form, the defendant and his behavior . . . .*" (Italics added.) The prosecutor reviewed defendant's background and character evidence, concluding that it "tells us very little, if anything . . . ." Thereafter, defense counsel attempted to rebut the prosecutor's arguments

---

[6]Defendant also contends that the trial court should have instructed the jury that it could impose the death penalty only if it found beyond a reasonable doubt that death was appropriate. We recently rejected an identical contention and do not reconsider it here. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

by reviewing the evidence purportedly showing defendant's "good side."[7] In light of the respective jury arguments, it is inconceivable that the jury failed to understand that it was permitted to consider this evidence in deciding the appropriate penalty.

### F. Nonstatutory Aggravating Factors

██ Defendant next contends that the trial court erred in refusing a proposed instruction which would have precluded the jury from considering as an aggravating factor any evidence not included in the statutory list of such factors read to the jury.

As we pointed out in *People* v. *Boyd, supra,* 38 Cal.3d at pages 772-776, while the 1978 death penalty law requires the jury's penalty determination to be based on a weighing of the specific statutory factors, the 1977 law (under which defendant herein was tried) appears to permit consideration of a broader range of evidence, including aggravating evidence of the defendant's character and mental condition "even if it did not relate to any specific aggravating or mitigating factor. [Citation.]" (*Id.,* at p. 772; see *People* v. *Murtishaw, supra,* 29 Cal.3d at p. 773.) Thus, defendant's proposed instruction was inappropriate under the 1977 death penalty law.

Moreover, the failure to instruct regarding consideration of nonstatutory aggravating factors clearly would be harmless unless defendant could point to some evidence which was admitted bearing on such factors. Defendant cites the pornographic magazine and the prosecutor's reference to defendant's selective breeding theories, but as we have previously discussed, such evidence was properly admitted in rebuttal as relevant to the penalty issue.

### G. Response to Jury's Inquiries

██ Defendant asserts that the trial court inadequately responded to various inquiries from the jury during its deliberations. We find no error was committed.

The jury inquired whether "there [is] any way our verdict could be changed if we gave life imprisonment without possibility of parole—our concern is that [defendant] would be paroled in later years." The jury also asked how many persons sentenced to life without parole subsequently have been paroled. Finally, the jury inquired, "Does the death penalty

---

[7] As defense counsel advised the jury, "Now, we've seen the bad side of Mr. Hovey. We have seen . . . the good side of Mr. Hovey. And I think we also heard . . . a sick side of Mr. Hovey. Out of that, you're going to have to make a decision."

automatically go to appeal?" In response to all these inquiries, the trial court, with the concurrence of both counsel, responded that "You must not speculate or consider matters not presented by way of legal evidence. Rather, you must follow the law as the court gave it to you and make the decisions following that law in accordance with the facts as you determine them to be from the evidence. [¶] Your responsibility is to reach a verdict to the best of your own ability following that procedure. You must do that without speculation concerning questions or matters outside of that which has been presented to you here in court as law or evidence."

We think the trial court's noncommittal response was sufficient, requiring the jury to follow the court's instructions and weigh the evidence without speculating on extraneous matters. In *People* v. *Ramos, supra*, 37 Cal.3d at page 159, footnote 12, we considered a similar question arising in the context of the 1978 death penalty law, stating that when the jury itself raises the commutation issue during deliberations, "the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences [life without parole and death] but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence. (Cf. *People* v. *Morse* [1964] 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)"

In the present case, of course, the trial court did not have the benefit of *Ramos*'s admonition, but nonetheless sufficiently anticipated our concern that the jury be admonished not to speculate regarding the possibility of commutation. We see no likelihood of prejudice from the fact that the trial court failed to give the further explanation that the Governor's commutation power would apply to both a life without parole sentence and a death sentence.

Similarly, we find the trial court's reply an adequate response to the jury's inquiry regarding automatic appeals. ■■■ As a general rule, the jury should not be advised regarding the availability of an appeal in death cases, because such information may dilute the jury's sense of responsibility in fixing the penalty. (See *People* v. *Morse, supra*, 60 Cal.2d at pp. 649-651; *People* v. *Linden* (1959) 52 Cal.2d 1, 27 [338 P.2d 397].) ■■■ Yet it would be inaccurate and misleading to advise the jury, upon inquiry, that a death judgment was final and unreviewable. The trial court's response, quoted above, was a satisfactory way of redirecting the jury's attention to its proper sentencing responsibilities without misinforming them regarding the availability of an appeal.

## H. *Defendant's Absence During Rereading of Testimony*

■■■ Defendant contends that he was improperly excluded from proceedings convened to reread certain psychiatric testimony at the jury's request. Defense counsel purported to waive defendant's presence, but defendant now challenges the effectiveness of the waiver.

As we previously observed in discussing a similar guilt phase contention, defendant is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (*People v. Jackson, supra,* 28 Cal.3d at pp. 309-310.) The rereading of testimony ordinarily would not be an event which bears a substantial relation to the defendant's opportunity to defend, and nothing in the present record indicates that defendant's personal presence would have assisted the defense in any way. Defendant's suggestion that the jury might have been favorably influenced by defendant's reactions to the reread testimony (which involved psychiatric testimony regarding his mental state) is entirely speculative and fails to carry his burden of establishing prejudice.

Defendant relies on *Bustamante* v. *Eyeman* (9th Cir. 1972) 456 F.2d 269, but that case is not controlling. There, the Ninth Circuit Court of Appeals remanded for further proceedings to determine whether a criminal defendant was prejudiced by being excluded from the rereading of the court's *instructions* to the jury. The remand was deemed necessary because the appellate record was entirely silent as to what transpired during the rereading of the instructions—no transcript of the proceedings was provided. On remand, the trial court held an evidentiary hearing and determined that nothing further occurred during the session other than replaying the judge's tape-recorded instructions. Accordingly, both the district court and court of appeals ultimately concluded that any error in excluding defendant was harmless beyond a reasonable doubt. (See *Bustamante* v. *Cardwell* (9th Cir. 1974) 497 F.2d 556, 557-558.)

In the present case, the record merely shows that various portions of testimony were reread to the jury, and defendant does not contend that any other exchanges between the judge and jury, or counsel and jury, took place. Accordingly, like the federal courts in *Bustamante,* we conclude that any error in excluding defendant from the proceedings was harmless beyond a reasonable doubt. (See also *People* v. *Conrad* (1973) 31 Cal.App.3d 308, 323-324 [107 Cal.Rptr. 421] [neither defendant nor his counsel was present at rereading of district attorney's opening argument]; *People* v.

*Morales* (1943) 60 Cal.App.2d 196, 200-201 [140 P.2d 461] [defendant absent from rereading of jury instructions].)

## I. *Constitutionality of 1977 Death Penalty Law*

Defendant repeats various constitutional arguments previously considered and rejected by us in prior cases, including the lack of adequate sentencing standards, and the failure to provide a system of proportionality review. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 315-317; *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587]; cf. *Pulley* v. *Harris* (1984) 465 U.S. 37, 53-54 [79 L.Ed.2d 29, 42, 104 S.Ct. 871].) We do not reconsider those arguments here. As for proportionality review, even were such a procedure mandated in this state, it is inconceivable that this defendant would benefit from it.

The judgment is affirmed.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,**—I concur in the judgment.

Nevertheless I am concerned at what point a series of errors, analytically deemed harmless individually, become prejudicial when evaluated collectively. On this general subject there appears to be a conflict between mathematics and literature. On the one hand, five times zero equals zero. On the other hand, as Plutarch pointed out nearly 20 centuries ago in *Of the Training of Children,* "water continually dropping will wear hard rocks hollow."

The majority concede at least five prosecutorial errors: admission of the Michele G. incident (*ante,* p. 569); *Griffin* violation (380 U.S. 609) (*ante,* p. 572); misuse of victim's photograph (*ante,* p. 576); comment on defendant's silence (*ante,* p. 580) and potential violation of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440,107 S.Ct. 2529]).

Like the majority I can rationalize the result in all the foregoing; however the last error causes me the greatest concern. The effect on the family of the deceased will inevitably and understandably have a devastating impact on a jury considering the defendant's fate. As Justice Powell wrote for the United States Supreme Court in *Booth,* "While the full range of foreseeable consequences of a defendant's actions may be relevant in other criminal and civil contexts, we cannot agree that it is relevant in the unique circumstance of a capital sentencing hearing." (482 U.S. at p. __ [96 L.Ed.2d at p. 449].)

In reversing a conviction in a case in which a victim impact statement was given pursuant to state law, he concluded that "We thus reject the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics, are proper sentencing considerations in a capital case." (482 U.S. at p. __ [96 L.Ed.2d at p. 451].) Of course, noted Justice Powell, one "can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." (482 U.S. at p. __ [96 L.Ed.2d at p. 452].)

Three years earlier our Court of Appeal reached a similar conclusion in *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 516-517 [203 Cal.Rptr. 276]. In commenting on the bereavement of the victim's family, the court declared: "The purpose of sentencing is to punish defendants in accordance with their level of culpability. We think it obvious that a defendant's level of culpability depends not on fortuitous circumstances such as the composition of his victim's family, but on circumstances over which he has control . . . the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of homicide in the first place. Such bereavement is relevant to damages in a civil action, but it has no relationship to the proper purposes of sentencing in a criminal case."

The instant judgment, pre-*Booth, supra,* 482 U.S. 496 [96 L.Ed.2d 440], and *Levitt, supra,* 156 Cal.App.3d 500, can be saved only because there was no evidence offered relating to the victim's family, only fleeting comment by the prosecutor in her closing presentation. And there was no objection made by defense counsel. Under these circumstances, the potentially prejudicial impact was minimal. However, I trust that the lesson of *Booth* and *Levitt* will guide counsel in future cases, not only as to presentation of evidence but also as to appropriate jury argument.

**BROUSSARD, J.**—I concur in the affirmance of the conviction and finding of special circumstances. With respect to the penalty judgment, however, the appropriate inquiry is not whether there exists a legitimate basis for believing the jury was misled as to its sentencing responsibilities (see maj. opn., *ante,* p. 583), but whether there is a " 'legitimate basis for finding *ambiguity* concerning the factors actually considered by the' jury." (*California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] (O'Connor, J., conc.), italics added.) In other words, in an ambiguous situation—one in which the jury may, or may not, have misunderstood its responsibilities —we must find error under the federal standard. Error does not require a finding that the jury was in fact misled, or was probably

misled; it requires only a finding that there is a legitimate basis (i.e., reasonable grounds) for believing it might have been misled. Because I believe that there is no legitimate basis to question whether the penalty jury in this case was misled concerning its responsibility, I concur in the affirmance of the penalty judgment.

Appellant's petition for a rehearing was denied April 21, 1988.