Filed 8/15/14  P. v. Molina CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE MOLINA,<br><br>    Defendant and Appellant. | B247924<br><br>(Los Angeles County<br>Super. Ct. No. BA381488) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Henry J. Hall, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

A jury convicted defendant Jose Molina of three counts of attempted murder, and found true allegations that the attempted murders were committed willfully, deliberately and with premeditation. Allegations of personal use and intentional discharge of a firearm, in one case causing great bodily injury, were also found true, as were allegations the crimes were committed for the benefit of a criminal street gang.

Defendant challenges the trial court's admission of the preliminary hearing testimony of an unavailable witness, contending the prosecution failed to use due diligence to secure the witness's attendance at trial. Defendant also challenges the exclusion of evidence he contends was relevant to impeach the unavailable witness. We find no merit in defendant's contentions and affirm the judgment.

**FACTS**

**1.      The Crimes and the Investigation**

On February 20, 2011, Omar B. and his brother, Pedro G., were visiting the home of their longtime friend, Leonardo C. Omar B. and Pedro G. lived about 20 miles away, and had visited Leonardo C.'s house only a few times during the past two years. The three men had been watching a soccer game with Leonardo C.'s family, and left the house to walk to a market on Valley Boulevard to buy some groceries. They were south of Valley Boulevard, returning from the store and walking through an alley around 4:00 p.m., when they were confronted by defendant and another man, standing at the other end of the alley. (Valley Boulevard is the southern boundary of El Sereno gang territory, and the area south of Valley Boulevard is territory of a rival gang, Metro 13; there is "constant feuding" between the two gangs.)

Defendant yelled out, "Where you from," which Omar B. understood to mean "from what gang were we." Defendant was holding a weapon with both hands, his arms fully extended, and was wearing a baby blue baseball cap. No one answered when defendant asked "where you from" (Omar B. was not a gang member) and defendant immediately started shooting, taking one or two steps forward. Defendant's companion "was trying to cover his face and he had a gun . . . in his hand," which he was holding

2

down next to his thigh when Omar B. first saw it. Then, the companion also started to walk forward and shot.

Omar B. was closest to defendant, and told his companions to "be careful" and to run. There were two or three shots before Omar B. turned and ran, and as he was turning he was shot in the left arm, and ran with his arm hanging down. He suffered two bullet wounds to his left arm. The shooting was rapid fire; the police later recovered ten 9-millimeter bullet casings and one live round.

Omar B. saw defendant's face clearly. "He was facing me head on and I was walking forward, so I saw his face well."

When the shooting stopped, the three victims went to a nearby house to ask for help. Omar B. "heard the noise from the car when it left quickly." Omar B. told police that, while they were walking back to Leonardo C.'s house from the store before the shooting, he had seen "a suspicious white car, a Lexus that had passed by quickly and then returned back again."

The day after the shooting, Detective Jorge Alfaro was assigned to investigate. He interviewed Omar B. while he was in the hospital. Omar B. told Detective Alfaro the shooter was a light-skinned Hispanic male wearing a blue baseball cap. A few days after the shooting, Omar B. identified defendant in a photo lineup. (Pedro G. and Leonardo C. were unable to identify anyone.) At trial, Omar B. was asked "what about the person's face did you recognize, any details?" and he replied, "Well, because of his wide nose and his moles that he has on his face, I never have forgotten that face." (Omar B. thought he had given this description to Detective Alfaro, but Detective Alfaro testified he had not been given any information about moles.)

Defendant was an El Sereno gang member. Michael Cruz and his brother, Henry Cruz, were also El Sereno gang members. Both Michael and Henry Cruz were on parole at the time of the shooting. On February 23, 2011, Officer Aaron Skiver conducted a parole search of the Cruz residence. Police recovered a photograph that included defendant and Michael Cruz with other known members or associates of the El Sereno gang. After the search, Michael Cruz was arrested for a parole violation. Detective

3

Alfaro interviewed Michael Cruz, and spoke to him about the shooting. Mr. Cruz was cooperative, and gave him information suggesting defendant was involved in the shooting. Detective Alfaro did not threaten to charge Mr. Cruz, and assured him that he (the detective) would keep his information and identity confidential, and would relocate him if he wished. After Detective Alfaro spoke to Mr. Cruz, defendant was arrested.

Shortly after the day he was interviewed, probably within the next week or so, Officer Skiver observed Michael Cruz at his usual routine around his neighborhood, going to and from where he worked and lived.

## 2. The Preliminary Hearing

Michael Cruz did not want to testify at defendant's preliminary hearing, and the district attorney sought and obtained a court order under Code of Civil Procedure section 1988 and Penal Code section 1332, authorizing service of a forthwith subpoena on Mr. Cruz as a material witness. The application stated that, "[u]pon producing Michael Cruz, the people will request that Michael Cruz be required to post a surety bond of at least $100,000 in accordance with California Penal Code section 1332, or to remain in custody until the conclusion of this matter in order to assure the witness's appearance in court." The application was supported by a declaration from Detective Alfaro, who recounted his efforts to serve a subpoena on Mr. Cruz. These included a telephone call from Mr. Cruz in which Mr. Cruz told the detective that he had already made it clear to Detective Alfaro in his interview that he would not come to court, and that the detective "would have to arrest him because he would not come to court and he would not testify."

The day before the preliminary hearing, Officer Skiver and his partner saw Mr. Cruz in front of his house on Lombardy Boulevard and detained him, telling him "he was needed for court." Officer Skiver notified Detective Alfaro, who then came and brought Mr. Cruz to court. (That was the last time Officer Skiver ever saw Mr. Cruz in the neighborhood.)

When Detective Alfaro brought Mr. Cruz to court, the detective, the prosecutor and Mr. Cruz had a conversation "while [Mr. Cruz] was sitting in the custody box in Division 30." The prosecutor asked Mr. Cruz whether or not he would return to court

4

voluntarily if they released him, and he promised to appear the next day. According to Detective Alfaro, Mr. Cruz said "he was changing his life around, he's no longer part of the gang, he wanted to leave that life behind, and he is more than willing to cooperate with us." The prosecutor and Detective Alfaro discussed "whether we believed him," and Mr. Cruz was released. The court ordered him to return the next day for the preliminary hearing, and he did so, accompanied by his mother.

At the preliminary hearing the next day, June 16, 2011, Michael Cruz identified defendant in the courtroom, and identified a photograph of the defendant and himself. He testified he and defendant were friends when the photograph was taken, and were members of the El Sereno gang. Mr. Cruz testified that the defendant called him on the telephone "on a Monday, over a month ago," and said "[t]hat he wanted to sell a gun," a nine-millimeter gun. The prosecutor asked Mr. Cruz if defendant told him "anything else about something that had occurred," and Mr. Cruz answered, "Just if I heard anything that happened on the other side." The prosecutor then asked, "And in your experience as a gang member, what did it mean to you when he said something had happened on the other side?" Mr. Cruz replied, "That it could be a shooting, or anything of any kind." Mr. Cruz testified that "the other side" is "[a]nother neighborhood," outside of El Sereno's territory. Defendant's counsel did not cross-examine Mr. Cruz.

Officer Rudolph Rivera, who saw Michael Cruz at the preliminary hearing, later testified at trial that when Mr. Cruz finished testifying and left the courtroom, he was "white as a ghost and crying." Officer Rivera said there were three females just outside the courtroom, and as soon as Mr. Cruz walked by them in the hallway, "all three of them immediately were on their cell phones texting." Officer Rivera used to see Mr. Cruz frequently "in and around the neighborhood of El Sereno," but never saw him after he walked out of the courtroom following his preliminary hearing testimony. (Officer Rivera also testified that "the other side" is "the other side of the train tracks is what they're talking about their enemy's territory.")

### 3. The Trial

The prosecution was unable to locate Michael Cruz for defendant's trial, and sought to introduce his preliminary hearing testimony. After a hearing, the trial court ruled the testimony was admissible, and it was read to the jury during the course of the trial.

Evidence was adduced about the shooting, as described in part 1, *ante*. Omar B. identified defendant. He testified, "I never have forgotten that face," and that he "never had any doubts" that defendant was the person who shot at him that day. When he identified defendant from the photo lineup a few days after the shooting, he was "[a] hundred percent sure." He had never seen defendant before. When he made the photographic identification of defendant, he was also presented with two "six packs" that did not contain defendant's photograph, but did contain photographs of Michael Cruz and Henry Cruz. He did not recognize anyone in those photographic lineups. (Officer Skiver testified that Michael Cruz and defendant do not look anything alike.)

In addition, the prosecutor presented evidence to establish the extent of Omar B.'s injuries, and to establish that defendant committed the crimes for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b).

The defense presented evidence from Guadalupe Esparza, an investigator for the public defender's office, who testified about measurements taken of the crime scene and various courtroom measurements. Dr. Scott Fraser, an expert in eyewitness identification, testified about many factors that can compromise the accuracy of an identification.

The parties stipulated that, during the preliminary hearing, Omar B. was never asked to give a physical description of the shooters, and was not asked and did not testify about any moles on either suspect's face. The parties also stipulated that the defense attorney at trial was not the defense attorney at the preliminary hearing, and Omar B. was not cross-examined at the preliminary hearing; that both Henry and Michael Cruz were interviewed by Detective Alfaro after their arrests for parole violations; and that Michael

6

Cruz had previous convictions for felony criminal threats in 2004, possession or purchase for sale of narcotics in 2005, and possession for sale of narcotics in 2007.

The jury found defendant guilty of all counts, found the attempted murders were committed willfully, deliberately and with premeditation, and found all the firearm and gang enhancement allegations true. The court imposed a total term of three consecutive life sentences, plus 25 years to life, plus 13 years four months. The court also ordered custody and good time/work time credits and made other orders not at issue in this appeal.

## DISCUSSION

Defendant argues the admission of Michael Cruz's preliminary hearing testimony violated his Sixth Amendment confrontation rights because the prosecution failed to use due diligence to secure Mr. Cruz's attendance at trial. He also argues the trial court erred in refusing to admit evidence that, when the police conducted a parole search of Michael Cruz's residence a few days after the shooting, they found nine-millimeter ammunition. We reject both contentions.

1.     **The Due Diligence Issue**

    a.     **The evidence of due diligence**

Before the jury was selected, the court held an Evidence Code section 402 hearing to ascertain whether the prosecution "exercised reasonable diligence" in its efforts to procure Mr. Cruz's presence at the trial. (§ 240, subd. (a)(5).) The hearing began on October 29, 2012, and revealed the following efforts.

Detective Alfaro testified, as described in part 2, *ante*, of the facts, about obtaining Mr. Cruz's presence at the preliminary hearing and his cooperation at that time, including Mr. Cruz's statements that he wanted to leave the gang life behind and was willing to cooperate. He testified that Mr. Cruz "testified truthfully [at the preliminary hearing], the exact same thing he told me" in his initial interview. After Mr. Cruz came to court voluntarily and testified, in the detective's opinion, truthfully, "I believed he was going to be cooperative. I – nothing led me to believe he was going to be a flight risk." (The prosecutor also represented to the court that Mr. Cruz was "extremely cooperative" at the

time of the preliminary hearing; that she would not have released Mr. Cruz the day before the preliminary hearing if she and Detective Alfaro had not been convinced he would voluntarily return; and neither she nor the detective "had any indication that he was going to be uncooperative.")

Then the prosecutor asked Detective Alfaro when he realized "something had changed in Mr. Michael Cruz' position towards this case." He replied that he often drove by the Lombardy Boulevard residence, "and I would never see him anymore." (Detective Alfaro also said that he used to see Mr. Cruz's motorcycle outside the house when he drove by, but stopped seeing it "[b]ack in March, April . . . of this year [(2012)]."") Then, in March or April 2012, Officers Huerta and Skiver told him that the "word on the street" was that there was a "green light" on Michael Cruz, and that his own brother, Henry Cruz, was supposed "to carry out that hit." (A green light on a person means the gang has ordered that the person be killed, and "[t]he consequences are death" if someone stays within gang territory after being labeled a snitch.)

When he learned of the "green light," Detective Alfaro went to the Lombardy Boulevard residence again and talked to Mr. Cruz's mother. At that time, he was not aware that Mr. Cruz's position "as far as being cooperative" had changed. Detective Alfaro wanted first to know Mr. Cruz's whereabouts, "because I wanted to relay to him . . . what I had heard and . . . for him to be aware of the situation." He "asked for his mother to have Michael Cruz give me a call back like he's done in the past." Mr. Cruz's mother was not cooperative; she asked the detective to leave her son alone and said her son could take care of himself.

After he spoke to Mr. Cruz's mother, Detective Alfaro "accessed department resources to see if he was maybe detained . . . , incarcerated, or if he had any forwarding address. I checked different resources to check about his whereabouts because I did know we had to contact him for the jury trial." Detective Alfaro was not able to contact him through any of those resources. He also checked to see if Mr. Cruz had been "filed identified" by any officers, but he had not. The detective asked Officers Huerta and

8

Skiver, who were familiar with the area and the gang, if they had seen him, and they had not.

Detective Alfaro testified that he began to believe that Mr. Cruz was "now uncooperative versus the way he had been at the time of the preliminary hearing" around May 2012, "when I was unable to locate him and the Mom would not relay any messages and I did not receive any phone calls from Michael Cruz as – just like I did in the past." (Detective Alfaro also testified that, between the preliminary hearing and when he came to believe Mr. Cruz had fled, he drove by the Lombardy Boulevard residence "well over 30 times," as he had an active investigation in the area; he did not knock on the door, but went by the address to "see if his motorcycle was there.") When Mr. Cruz testified at the preliminary hearing, Detective Alfaro believed there was a possibility that a "hit" would be put out on him. But the detective "believed he would stay in contact with me in case anything were to happen, I could help him."

Detective Alfaro sought the assistance of the district attorney's investigator, and turned the matter over to Investigator Richard Collins, who kept Detective Alfaro apprised of developments.

Mr. Collins, who had been an investigator for the district attorney's office for 12 years and was assigned to "central hardcore gangs," began trying to locate Michael Cruz on July 17, 2012. When he spoke with the prosecutor that day, he understood Mr. Cruz was going to be uncooperative.

On July 17, Mr. Collins checked to see if Mr. Cruz was in custody, and checked several different databases. Those databases produced a residence address and phone numbers. Mr. Collins called those phone numbers, and was able to contact Mr. Cruz's mother. She told him that Mr. Cruz "was not willing to cooperate with the LAPD, that her son had moved on with his life, and he was reluctant to help." His mother said she saw her son occasionally, so Mr. Collins left his contact information to pass on to Mr. Cruz. Mr. Collins also left a voicemail message at another phone number.

9

The next day, Mr. Collins drove to the Cruz residence on Lombardy Boulevard, but no one was there. He determined from the Employment Development Department that Mr. Cruz had a work address.

On July 19, Mr. Collins drove to the home of David H., a former employer of Mr. Cruz; Mr. Cruz had told police he sometimes stayed with David H. David H. did not know where Mr. Cruz was, but he provided a phone number and an address for Mr Cruz's grandparents.

Between July 18 and July 25, Mr. Collins drove to several other residence addresses he had obtained from the databases. At one of those locations, neighbors recalled Mr. Cruz living there, but said he had moved away.

On July 25, Mr. Collins drove to the grandparents' house. Mr. Cruz's grandfather told Mr. Collins he had not seen or heard from Mr. Cruz for over one month, and that Mr. Cruz knew that the police wanted him. Mr. Collins gave the grandfather his business card and asked him to have Mr. Cruz call him. That day, Mr. Collins went again to the Lombardy Boulevard address. He noticed the Mercedes Benz he had seen outside the house when he stopped by on July 18 was still parked in the same spot it had been. He recorded and ran the license plate number; it was registered to Michael Cruz. It was dirty and looked as though it had not been driven recently.

Also on July 25, Mr. Collins went to the work address he had obtained on July 18, and spoke to the general manager, Hector J. Hector J. told Mr. Collins that Mr. Cruz was employed there, but would not arrive for another hour. Mr. Collins, who was driving an unmarked Crown Victoria, waited for Mr. Cruz to arrive. While he was waiting, Mr. Cruz called Hector J. and asked him if there was a police car in the parking lot, "the manager told him yes, the subject [(Mr. Cruz)] asked what do they want, the manager told him they want to talk to you, and the subject drove off, and never reported to work."

On July 31, Hector J. told Mr. Collins he planned to hire a replacement for Mr. Cruz because he had not returned to work. Hector J. gave Mr. Collins a cell phone number for Mr. Cruz; Mr. Collins left a message at that number but received no response.

10

In August, Mr. Collins checked on two occasions to see if Mr. Cruz was in custody, and checked one of the databases for any address changes, but there were no updated addresses.

On September 6, 2012, Mr. Collins got a call from a woman who identified herself as Mr. Cruz's wife. She told him that Mr. Cruz resided with a cousin in Perris, California, and gave him a location and cell phone number. Mr. Collins called Detective Alfaro to relay that information on September 10, and Detective Alfaro returned his call on September 11. (The trial court took judicial notice that September 6 was a Thursday and September 10 was a Monday.)

On September 19, 2012, Detective Alfaro and others, including Detective Ernest Garcia and Officer Huerta, went to the location given by Mr. Cruz's wife to try to serve a material witness subpoena on Mr. Cruz. (The day before, on September 18, Detective Garcia took over from Detective Alfaro as lead investigator trying to locate Mr. Cruz, and Detective Alfaro told him that Mr. Cruz might be residing in Perris.) Mr. Cruz was not there. The residents, who were relatives of Mr. Cruz, told the police that Mr. Cruz "had stayed there, but not for very long." They said they had not seen Michael Cruz in over a week. They believed the reason he had been there was that he was having marital problems. They were unable to give Detective Garcia any forwarding address or phone number.

Meanwhile, Mr. Collins maintained contact with Mr. Cruz's wife, and called her on September 17. She told Mr. Collins that Mr. Cruz was no longer at the location she had given him earlier. After that, Mr. Cruz's wife gave Mr. Collins information that a stepsister lived in Rancho Cucamonga, but the information did not lead to Michael Cruz, and Mr. Collins got the impression that Mr. Cruz's wife was giving him false information.

Mr. Collins checked for warrants, and continued to check databases in September and October, but found no new leads or information.

On October 16, Detective Garcia checked another database providing a variety of criminal reports and other information, but found nothing. On October 19, he contacted

11

Hector J., but Hector had not seen Mr. Cruz since the day Mr. Cruz fled from his worksite. Detective Garcia also spoke by telephone to Mr. Cruz's estranged wife, who had provided the address in Perris. She said she had not seen Mr. Cruz since July 18, and had no additional information.

On October 29, Mr. Collins checked with coroners' offices, hospitals and jails in Riverside and San Bernardino counties. He searched unsuccessfully for a social media account. He called the cell phone number he had obtained, but the phone was not receiving incoming calls. He checked several databases again, but found no new information.

On October 29, Detective Garcia spoke to Officer Huerta, who was familiar with the El Sereno area and the El Sereno gang, about Michael Cruz. Officer Huerta said he had gone by the Lombardy Boulevard residence that day. The garage door was open, and he did not see any of the vehicles that Michael Cruz normally drove (a motorcycle and the Mercedes Benz) in the area or in the garage. Detective Garcia ran more database searches, a DMV check, a reverse directory check, and a rap sheet check, all to no avail. He searched the probation system three times in October, with no positive results. He contacted two Los Angeles County hospitals, the county registrar's office for voter registration information, and the Department of Corrections. He checked a database for bankruptcy and civil filings, the coroner's office and the Riverside County Sheriff's Department, with no results.

The trial court found that Mr. Cruz was unavailable within the meaning of Evidence Code section 240. Among other things, the court found that the witness's absence was triggered by the fact that he was green lighted, and Mr. Cruz had "every reason in the world to make himself absolutely non-available as humanly possible." Further, Mr. Cruz's testimony "doesn't really say a whole lot," was "marginally relevant" and "border[ed] on being insignificant and sidled right up to being irrelevant as far as I can tell." The court characterized the efforts to find Mr. Cruz as "extraordinary" and found the search was "clearly" timely begun, and leads were competently explored. The

court concluded that "certainly there was a longstanding, more than reasonable good faith effort and attempt to find Mr. Cruz."

### b. The applicable law

The principles governing defendant's claim are well settled. " ' "The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial." [Citations.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675 (*Fuiava*).)

In California, this exception is codified in Evidence Code section 1291. "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] . . . The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (§ 1291, subd. (a)(2).) A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (§ 240, subd. (a)(5).)

*Fuiava* tells us that "reasonable diligence" is often described as "due diligence." (*Fuiava, supra,* 53 Cal.4th at p. 675.) Further: " 'We have said that the term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." [Citations.] Relevant considerations include " 'whether the search was timely begun' " [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.]" (*Ibid.*)

13

A trial court's due diligence determination is subject to independent review. (*People v. Cromer* (2001) 24 Cal.4th 889, 901.)

**c.     This case**

Defendant first argues that the prosecution did not comply with its " 'duty to use reasonable means to prevent a present witness from becoming absent.' [Citation.]" (*People v. Louis* (1986) 42 Cal.3d 969, 991 (*Louis*).) He claims that, during the 13 months between the preliminary hearing and July 17, 2012 (when Detective Alfaro handed over the efforts to locate Mr. Cruz to Mr. Collins), the prosecution "failed in its duty to exercise reasonable diligence to maintain contact with [Mr. Cruz] and take 'adequate preventive measures' to secure his presence at trial." (See *People v. Friend* (2009) 47 Cal.4th 1, 68 ["when there is knowledge of 'a "substantial risk" ' that an ' "important witness would flee," ' the prosecutor is required to ' "take adequate preventative measures" to stop the witness from disappearing' "].) The failure in this initial duty, defendant contends, "rendered futile" the prosecution's subsequent attempts to locate Mr. Cruz.

We disagree.

The Supreme Court has said that "we could not properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive." (*People v. Hovey* (1988) 44 Cal.3d 543, 564 (*Hovey*).) "Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing. [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 342; see *Hovey*, at p. 564 ["In *Louis, supra,* [42 Cal.3d at pages 989-991], we held that if a particular witness's testimony is deemed 'critical' or 'vital' to the prosecution's case, the People must take reasonable precautions to prevent the witness from disappearing."].)

First, we do not agree with defendant's contention that this is a case like *Louis*, where there was "no witness whose testimony was more critical to the prosecution's case" and also "no witness whose credibility was more suspect" than the absent witness.

14

(*Louis, supra,* 42 Cal.3d at p. 989.) In *Louis*, the witness's preliminary hearing testimony was the sole evidence identifying the defendant as the shooter; the defendant and his codefendants were tried before separate juries that heard virtually the same evidence, except for the absent witness's testimony, and the codefendants went free while the defendant was sentenced to death; and the witness was "known to be highly unreliable and likely to disappear . . . ." (*Id.* at pp. 974, 989.) Moreover, in *Louis*, the prosecutor "may have taken no steps [to prevent the witness's disappearance] because he hoped that [the witness] would disappear," since the witness " 'would not look as good in person as he does in reading out of the transcript . . . .' " (*Id.* at p. 993, fn. 7; see *People v. Thomas* (2011) 51 Cal.4th 449, 502 ["Subsequent cases have limited the holding in *Louis* to its peculiar facts."].)

Here, the testimony was far from being "critical" or "vital"; as the trial court aptly stated, the testimony "doesn't really say a whole lot," was "marginally relevant" and "border[ed] on being insignificant . . . ." While the testimony did of course provide some corroboration of Omar B.'s identification of defendant as the perpetrator, it was not testimony that was crucial to obtaining a conviction. (Cf. *Fuiava, supra,* 53 Cal.4th at p. 676 ["the reasonableness of the activities [to locate the witness] is supported by the circumstance that her testimony was not of critical importance in the trial"].)

Second – and entirely apart from the fact that Mr. Cruz's testimony was not vital to the case – we do not agree with defendant's claim that the prosecution knew, at the time of the preliminary hearing, that there was a "substantial risk" Mr. Cruz would flee after that hearing. Defendant points to Mr. Cruz's reluctance to testify at the preliminary hearing, generating the prosecutor's application for a material witness subpoena; Mr. Cruz's gang affiliation; and his "sophistication and experience with the criminal justice system," asserting these factors "made him a known unreliable and untrustworthy witness" who would be unlikely to appear for trial. But if these factors alone were sufficient to require the prosecution to keep tabs on a material witness, the prosecution would be required to do so with virtually every gang-member witness. We do not think this is the law.

Nor do we accept defendant's contention that it was "not reasonable" for the prosecutor to believe Mr. Cruz was not a flight risk immediately after the preliminary hearing. The trial court apparently credited the testimony of Detective Alfaro and the representations of the prosecutor that they believed Mr. Cruz when he told them he "was changing his life around, he's no longer part of the gang, he wanted to leave that life behind, and he is more than willing to cooperate with us," and the detective's testimony that, while he believed there was a possibility that a "hit" would be put out on Mr. Cruz, he also believed Mr. Cruz "would stay in contact with me in case anything were to happen," so that the detective could help him. (See *People v. Cromer, supra,* 24 Cal.4th at p. 902 ["the trial court's resolution of disputed factual issues, often by determining the credibility of witnesses, is reviewed deferentially on appeal"; the appellate court determines whether those facts "do or do not demonstrate prosecutorial due diligence"].)

Defendant insists there were "relatively simple steps" the prosecution could have taken to prevent Mr. Cruz from disappearing before trial, such as extending his parole (which ended about two months after the preliminary hearing) or setting bail. We agree with the trial judge, who observed that "the only real option that was available at the time was to set bail on Mr. Cruz, and the reality is that has the functional result of having him in custody . . . . The matter realistically was not going to start trial for at least a year, and it's not realistic to keep a civilian witness in custody for a year pending." (Cf. *Hovey, supra,* 44 Cal.3d at p. 564 ["it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply 'disappear,' long before a trial date is set"].)

In short, we cannot view this case as one where the prosecution, immediately after the preliminary hearing, should have "take[n] reasonable precautions to prevent the witness from disappearing." (*Hovey, supra,* 44 Cal.3d at p. 564.) It is the ordinary case where the prosecution was not required to keep " 'periodic tabs' " on a material witness. (*Ibid.*) As soon as Detective Alfaro received information that Mr. Cruz had been "green lighted," in March or April 2012, he began the prosecution's efforts to find Mr. Cruz, visiting his residence and seeking the cooperation of his mother, checking databases, and

enlisting the help of other officers to locate Mr. Cruz, and only then did he come to believe that Mr. Cruz no longer intended to cooperate.

The subsequent efforts by Detective Alfaro, Investigator Collins, and Detective Garcia to find Mr. Cruz were extensive, and they show that all the factors relevant to a determination of due diligence – whether the search was timely begun, the importance of the witness's testimony, and whether leads were competently explored (*Fuiava*, *supra,* 53 Cal.4th at p. 675) – favored an affirmative finding. To this we must add that, after he was "green lighted," Mr. Cruz was purposely evading service. This is demonstrated by, among other things, his flight from his place of employment, never to return, when he discovered that the authorities had tracked him there.

We note one other point. Defendant complains the prosecution's efforts were "half-hearted, belated, and unlikely to succeed"; that there were gaps when the investigation "stalled" and when "nothing at all" was done to locate Mr. Cruz; and that there were delays in relaying information, all of which "did nothing more [than] ensure [Mr. Cruz] would continue successfully to evade being served." We reject this characterization of the extensive efforts to locate Mr. Cruz, demonstrated in the record. The Supreme Court's comments in *People v. Cummings* (1993) 4 Cal.4th 1233, 1298 are equally apt here: "The trial court found due diligence. We find due diligence. That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness. They did."

Finally, defendant argues that, at the preliminary hearing, he did not have "the right and opportunity to cross-examine the declarant 'with an interest and motive similar to that which he has at the hearing,' " as required by Evidence Code section 1291. (*Id.*, subd. (a)(2).) He says that "defense counsel likely did not extensively cross-examine [Mr. Cruz] because, given the charges . . . and the lowered burden of proof at the preliminary hearing, the chance [defendant] would not be held to answer [was] almost non-existent." We do not agree with defendant's contention.

17

*People v. Zapien* (1993) 4 Cal.4th 929, 975 (*Zapien*) is instructive. "Frequently, a defendant's motive for cross-examining a witness during a preliminary hearing will differ from his or her motive for cross-examining that witness at trial. For the preliminary hearing testimony of an unavailable witness to be admissible at trial under Evidence Code section 1291, these motives need not be identical, only 'similar.' [Citation.] Admission of the former testimony of an unavailable witness is permitted under . . . section 1291 and does not offend the confrontation clauses of the federal or state Constitutions—not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution."

In *Zapien*, the court concluded that the defendant's interest and motive for cross-examining the witness during the preliminary hearing "were sufficiently similar to those existing at trial," because that testimony "had the same tendency to establish defendant's guilt. Defendant's interest and motive in discrediting this testimony was identical at both proceedings." (*Zapien, supra,* 4 Cal.4th at p. 975.) Further, the court said, "[d]efense counsel's testimony that he chose, for strategic considerations, not to vigorously cross-examine [the witness] does not render her former testimony inadmissible. As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*Ibid.*; see *People v. Carter* (2005) 36 Cal.4th 1114, 1172-1173 [rejecting claim that the defendant's confrontation rights were violated "because defense counsel's brief cross-examination constituted incompetent representation"; " 'as long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony . . . does not offend the confrontation clause . . . simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective' "]; *People v. Smith* (2003) 30 Cal.4th 581, 611 [rejecting contention that

"a defendant has less incentive to cross-examine at the preliminary hearing than at trial"; "we have routinely allowed admission of the preliminary hearing testimony of an unavailable witness"].)

We see no basis for reaching a different conclusion in this case.

## 2. The Exclusion of Evidence of Nine-millimeter Ammunition

The defense sought to adduce evidence that nine-millimeter ammunition was found during the parole search of Michael Cruz's residence a few days after the shootings. The prosecutor described this as a third party culpability issue, and argued the evidence had no connection to the crime and was irrelevant. Defense counsel argued "it's completely relevant that two days . . . after this crime was committed that there was ammunition recovered in two suspect[s'] home and not my client's."

The court initially indicated it was relevant to the Cruz brothers' bias that ammunition was found and neither of them were prosecuted for a parole violation, but decided to consider and revisit the issue later. The prosecutor subsequently advised the court that Officer Skiver, who conducted the parole search, attended a parole violation hearing for Michael Cruz. Mr. Cruz was found not to be in violation of parole because he was living elsewhere at the time (and Henry Cruz's parole officer found no violation because the ammunition was not found in his room). The court ruled that if defense counsel "ask[ed] about the one nine millimeter casing" to establish bias, the court would allow the prosecutor to introduce evidence that, "in fact, they attempted to violate Michael Cruz based on that and that no violation was found and that no violation was pursued as to Henry Cruz." The court concluded that "it's not reasonable nor is it fair to create an illusion of bias when, in fact, what the bias came to or would establish[, i.e.,] some benefit of working with the police, didn't come to pass." The prosecutor asked to be advised in advance if defense counsel "decides at some point to go there," and the court agreed, saying, "[f]air enough," and "as of right now, it's excluded."

Then, in questioning Officer Skiver about the parole search of the Cruz residence, defense counsel asked, "And during that search you, in fact, recovered one live nine

millimeter –" when she was interrupted by an objection. The objection was sustained and the question stricken from the record.

At the next recess, the court clarified its ruling: "My recollection of where we left this was that the fact that contraband was found that constituted a violation of parole was fair game, again, recognizing that . . . the Cruz brothers were not violated on their parole, but then again, we know that parole revocation proceedings were initiated . . . . [¶] I'm going to make this ruling just as clear as I can possibly make it. There is no evidence to link the nine-millimeter ammunition up to the nine-millimeter ammunition that was used in this case. They're not the same brand. There's nothing that links it up. So as far as I'm concerned, it's far more prejudicial than probative. It has no probative values other than to establish that the Cruz brothers were in violation of parole. I've instructed people to refer to it as contraband. From here on out, it will be referred to as contraband and I will not hear any further evidence about ammunition found at the Cruz residence period."

Defendant contends the exclusion of the ammunition evidence violated numerous constitutional rights, including his right to present a defense and to a fair trial. He says the excluded evidence was "highly relevant" and "showed that ammunition consistent with the caliber of weapon used in this case was found in [Mr. Cruz's] room," and when he was interrogated, he implicated defendant "thereby diverting attention away from himself and by making [defendant] a suspect." Defendant argues the evidence was relevant "not only to impeach the veracity of [Mr. Cruz's] preliminary hearing testimony, but was crucial to [his] defense that [he] was mis-identified"; the "sanitized version" of what occurred when Mr. Cruz was arrested for parole violations left the jury "with an untrue version of what actually occurred."

We find no merit in defendant's argument.

First, the only relevance of the ammunition evidence was, as the trial court observed, to show a motive to lie in order "to appease the police and get out from underneath the parole violation." The court permitted the defense to adduce evidence that the Cruz brothers were arrested for parole violations and that contraband was booked into evidence, and the parties stipulated that Detective Alfaro interviewed them after their

20

arrests a few days after the shooting. Thus, the defense was plainly permitted to show Mr. Cruz's motive to fabricate. Indeed, defense counsel argued to the jury that if Mr. Cruz had testified at trial, "you would have been able to see that he's trying to avoid a way out of being a suspect in this case"; that it was only after the police interviewed the Cruz brothers that defendant's photo was put in a six-pack; and that was because Mr. Cruz snitched: "Remember, he was on parole. He potentially was looking at more time in jail or prison, and he was a suspect in the case."

Second, the trial court was clearly correct that the ammunition evidence was irrelevant for any other purpose. The only point in identifying the contraband found in the parole search is, as defendant argues, to show "that ammunition consistent with the caliber of weapon used in this case was found in [Mr. Cruz's] room" – that is, to suggest to the jury that Mr. Cruz may have been involved in the crime. But it is well-established that third party exculpatory evidence is only admissible if there is evidence "linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) As the trial court concluded, "[t]here is no evidence whatsoever that links that nine millimeter bullet up to this case," and the evidence was "far more prejudicial than probative." There was no error.

### DISPOSITION

The judgment is affirmed.


GRIMES, J.


We concur:



BIGELOW, P. J.



RUBIN, J.

21