Filed 9/6/16  P. v. McGrane CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RONALD DAVID MCGRANE,<br><br>    Defendant and Appellant. | G050379<br><br>(Super. Ct. No. 13 HF1694)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

A jury convicted defendant Ronad David McGrane of elder abuse with a true finding he personally inflicted great bodily injury on a person 70 years of age or older and assault with a deadly weapon with a true finding he personally inflicted great bodily injury. The trial court sentenced defendant to four years in prison.

Defendant's sole contention on appeal is that the court prejudicially erred in finding the victim, Shirley Pazder, unavailable and admitted her preliminary hearing testimony at trial. We disagree and affirm the judgment.

**FACTS**

*Pazder's Preliminary Hearing Testimony*

At the preliminary hearing, then 73-year-old Pazder testified to the following: Around 5:45 a.m. one Sunday, she was in her wheelchair inside a post office building waiting for her bus. A man she had previously talked to came into the building to retrieve his mail. He left and was getting into his car when a second man, who looked angry, walked partway in and then back out. Pazder had seen the second man before, both on the street collecting cans and in the bus pavilion.

After the second man left, Pazder stood up and started preparing her wheelchair for the bus. Without saying anything, a man came up behind her, hooked his arm around her neck, and pulled her head back. She believed he was wearing something slick. The man struck her with something in his left hand. Her lip was cut and she bled "all over the place." At that point, the man released her and left the building. She turned around, but did not see him leave.

Pazder called 911 and gave a statement to the responding officer. She described the man as angry, and about the same height and build as the officer, with clean clothes in the form of, "plain old pants and a T-shirt."

Pazder was transported to the hospital, where she received stitches. She did not remember seeing any photographs and could not identify a man (defendant) officers brought to the hospital as the person who had attacked her.

2

On cross-examination, Pazder testified she lived in a motor home and did not associate with the homeless. When asked in court if she recognized defendant, she said she did not.

*Other Evidence*

Around 6:07 a.m., police officer Darrel Short[1] arrived at the scene in response to Pazder's 911 call. He saw Pazder sitting on the floor holding her mouth, with blood "coming down her hands . . . on her clothing and on the floor in front of her." Pazder "was very frantic" and still talking to the 911 dispatcher. Officer Darrel heard Pazder telling the dispatcher her attacker was a clean shaven male Caucasian whom she believed to be "in his 20's wearing a blue sweat suit." She indicated she had previously seen the man at the bus depot pushing a bicycle.

Officer Darrel shared the information with other officers conducting an area search. Officer Michael Short arrived shortly after and talked to Pazder, who described the man to him as a male Caucasian in his 30's, "wearing a blue or gray sweat suit" with short "buzz-cut" hair that "was growing out."

Officer Darrel began searching the surrounding area, trying to locate a suspect matching the description given by Pazder. At approximately 6:55 a.m., he saw defendant pushing a bicycle near a bus stop. Defendant appeared "to be in his 40's . . . with short hair, wearing a gray sweatshirt, [and] black pants with stripes down the sides." Officer Darrel briefly lost sight of defendant but saw him again one minute later sitting on a bench about one block away from the post office where he was already talking to two police officers. Officer Darrel joined them and the three officers questioned defendant.

During the questioning, defendant acknowledged he had entered the post office around 6:00 a.m. and saw a woman sitting by the front door. He first claimed he

---

[1] Because there are two police officers with the last name of "Short" involved in this case, we shall refer to them by their first names.

only checked the front and then left, but later admitted he went in a second time "almost right afterward."

An officer pulled a wood chip from the bottom of defendant's boot because it appeared to match the wood from a shattered bench next to the post office. The same officer believed he saw blood splatter on defendant's boots. Officer Darrel booked the woodchip and defendant's boots into evidence. He also swabbed defendant for DNA and checked defendant's fingernails and boots. Another officer had defendant's fingernails clipped.

Officer Michael reached defendant's location a few hours later after contacting several other potential suspects. Officer Michael observed defendant had short hair, "like a buzz cut growing out" and "was wearing bluish gray track pants, bluish gray sweater, [and] tan boots." Defendant had a bicycle and bags with him. Upon going through the bags, Officer Michael discovered "[a] corkscrew wine bottle opener," which he seized and booked into evidence along with defendant's clothing, which appeared well worn and dirty or filthy. He arrested defendant.

A surveillance video showed a man entering and leaving the post office. Soon afterwards, another man approached the post office and looked through a window near the front. The second man appeared to be in his 30's or 40's wearing a dark gray or blue hooded sweatshirt and pants. He entered the post office, left, then returned and went inside carrying a pointed object in his hand. About 30 seconds later, the man exited and looked as if he was putting something in his pocket.

Officer Darrel went to the hospital where Pazder was being treated. He showed her a six-pack photo lineup to see if she could identify the suspect. After he read Pazder the photo lineup advisement form, she agreed to look at the photographs. When they reached defendant's photograph, Pazder paused and asked to set that one aside. After they finished going through the remaining photographs, Pazder asked to see defendant's photograph again.

4

The parties stipulated Pazder suffered "a 15-centimeter severe complex laceration . . . on her left upper lip and central lip" that "extended into her left cheek." The injury required "an extensive complex repair to [her] left upper lip and left cheek laceration with flap reconstruction." Pazder also had a superficial small laceration to the side of her neck that did not require stitches.

The Orange County Public Health Laboratory was unable to find any DNA or biological material on the bottle opener, defendant's boots, pants, or fingernail clippings that were foreign to defendant. But the forensic scientist who performed the tests testified certain people are not "good D.N.A. shedders" and the length and condition of the contact may affect whether DNA can be detected. For example, if "clothing has been worn for a while, then the person's D.N.A. of the clothing could overwhelm that area that was swabbed."

## DISCUSSION

Defendant contends the court prejudicially erred in admitting Pazder's preliminary hearing testimony at trial. We disagree.

*1. Due Diligence Hearing*

The prosecution filed a motion to admit Pazder's preliminary hearing testimony on the basis she was unavailable. The court held a due diligence hearing at which the following evidence was presented.

Pazder appeared in court for a hearing on June 3, 2013 in response to a subpoena mailed to 303 Broadway Street, No. 71, Laguna Beach. She appeared in court again on June 18 for the preliminary hearing as ordered.

After the court set a jury trial for August 19, the prosecution sent a subpoena to Pazder at the Broadway address. But on the day set for trial, defense counsel expressed concern about defendant's mental competence. The court suspended criminal proceedings and set a competency hearing. On August 28, the district attorney's office

5

received a letter from Pazder, with the Broadway address as the return address, advising she did not want to be located and was leaving the area.

At the end of October, the court found defendant competent and scheduled a jury trial for December 9. In mid-November, the prosecution assigned Nasario Solis to locate Pazder. That month, Solis mailed a subpoena to Pazder at the Broadway address but she never responded. Solis did not learn Pazder was homeless until the next month.

On December 5, he drove to her last known address on Broadway and discovered it was a private mailbox business. An employee there informed him that although Pazder frequented the area, she had closed her account in mid-November and he had not seen her since. Solis drove around the area for several hours looking for Pazder but was unable to find her. He also spoke to homeless people in the area who said they had not seen her in a while. Solis prepared a "be on the lookout" flier for Pazder and left a copy of it.

Solis then went to the Laguna Beach Police Department. He contacted Officer Darrel, who told him he had not seen Pazder for at least a month. The victim witness liaison also had no information regarding Pazder's current whereabouts. Neither did the liaison between the homeless and the Laguna Beach Police Department, who told Solis he had not spoken with Pazder since sometime in November. The former investigator believed Pazder had a daughter but he did not know where she could be found. Solis left a copy of the flier he had prepared.

Solis called the only phone number he had for Pazder but it was no longer in service. A records check on Pazder revealed no additional information. She was not in custody, had no vehicles registered in her name, and had no address listed with the Department of Motor Vehicles other than the Broadway address. Nor did the local aid services show she was receiving any services.

On December 7, Solis walked around the main beach area of Laguna Beach for several hours asking if anyone had seen Pazder. It was an area where many homeless

6

frequented. Those he spoke with told him they had not seen her in a while and to possibly check some of the other beaches.

Two days later, on the date scheduled for trial, the prosecution filed an amended complaint. Defendant waived time for jury trial and a pretrial hearing was set for January 6, 2014. The trial was continued to March, and then May.

Solis retired from the district attorney's office on December 12 and was rehired on January 6, 2014. During that time, Solis looked for Pazder a few times a week by driving down to the main beach, around the streets, and along the Pacific Coast Highway towards Dana Point and Newport Beach. Upon his rehiring, Solis continued looking for Pazder.

On February 26, the district attorney's office gave Solis a subpoena to serve Pazder. Solis performed a complete records check and also searched a private investigative service Web site for "Shirley Pazder" and "Shirley Calhoun." He located a post office box in Springfield, Massachusetts, but personnel there informed him Pazder's most recent address was the one on Broadway.

On March 7, Solis went to the Broadway address to see if Pazder had reopened her mailbox but she had not. The employees suggested possibly searching Newport Beach. Solis drove around various areas of Laguna Beach and talked to several individuals, but they were unable to provide any information about Pazder's whereabouts.

Three days later, Solis provided an updated flier to the Laguna Beach Police Department and spoke to several officers. They told him Pazder was most likely somewhere in Newport Beach near Fashion Island and had a daughter named Katrina Calhoun.[2] Solis conducted a records search for her and located an address in Northern

---

[2] Because Katrina Calhoun shares the same last name as one of the names under which Solis had for Pazder, we shall refer to her by her first name.

7

California. Although he called her phone number and left a message, she never called back.

On March 11, Solis went to the Newport Beach Police Department and left fliers and subpoenas before going to a bus station near Fashion Island to look for Pazder. He handed out fliers to the bus drivers. One bus driver thought she saw Pazder a few weeks earlier with her wheelchair. Another person told Solis that Pazder frequented the library. Solis went to the library and looked around before being asked to leave but did not see Pazder. He also received an anonymous call Pazder might be at a bus stop in Laguna Beach. Although he went to the location and drove around the area, he was unable to locate her.

In March and April, Solis went to another bus stop, handed out fliers to bus drivers, and spoke to people in the area. He also made additional unsuccessful attempts to contact Katrina.

On April 14, Solis received a call from Virgina Leyva, who identified herself as another of Pazder's daughters. Leyva explained that Katrina had recently undergone extensive surgery and was unable to return his calls. She told Solis her mother knew he was looking for her but did not want to cooperate or the case to continue. Nevertheless, she provided Solis with a phone number and an address. No one answered the phone when Solis called and the address was to a private mailbox business. Solis continued to call the new number and left a message but received no response.

Three days later, a passenger on a bus called Solis and informed him Pazder was on the bus, which was heading towards Long Beach. But the passenger called back shortly after and said Pazder had gotten off the bus.

On April 19, a bus driver called Solis that she was the one who had asked the passenger to call him two days earlier. The bus driver informed Solis that Pazder knew the district attorney's office was looking for her but she did not want to cooperate.

The bus driver also said Pazder would sometimes take a bus to San Clemente or to Long Beach, "but off and on."

Early the next month, Solis went to the private mailbox in Newport Beach where Pazder had rented a mailbox and provided a flier to the owner, who said he recognized her but had not seen her in a couple of weeks. Solis looked around the area for Pazder but could not locate her.

On the date set for trial, May 14, 2014, the owner of the private mailbox business called Solis, informing him Pazder was there. Solis went there but was told Pazder had just walked over to the nearby supermarket. Solis went to the supermarket but could not find her. The manager of the supermarket recognized Pazder as someone who frequently went into the store, stole wine bottles, and became irate and uncooperative when confronted. The manager told Solis he would call him the next time she entered the store. That same day, Solis talked to several homeless people who said they knew her and "had seen her off and on in the last couple weeks" but tried to stay away from her. He looked for Pazder for about two hours.

After hearing the evidence, the trial court ruled Pazder was unavailable and that the prosecution had exercised due diligence in attempting to locate and subpoena her. It noted "the case [was] somewhat unique in that most witnesses . . . have contacts [which makes them] easier to find [whereas h]ere it's obviously more difficult to locate a witness that is homeless." The court further observed the main issue in the case was the identity of the assailant. "I think we can all agree that the alleged victim got assaulted. The real question is who did it? Was it this defendant or maybe one of the other guys that was stopped and questioned. There's no physical evidence. There's no D.N.A."

2. *Legal Principles*

"A criminal defendant has a state and federal constitutional right to confront witnesses, but the right is not absolute. If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which

9

the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial. In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial. [Citations.] [¶] '[T]he term "due diligence" is 'incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."' [Citation.] Relevant considerations include the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored." (*People v. Sanchez* (2016) 63 Cal.4th 411, 440.)

In assessing the prosecution's reasonable diligence in locating a missing witness so as to use that witness's preliminary hearing testimony, we conduct a "twofold inquiry." (*People v. Cromer* (2001) 24 Cal.4th 889, 900.) We first determine the historical facts: "a detailed account of the prosecution's failed efforts to locate the absent witness." (*Ibid*.) If those facts are in dispute, we deferentially review the trial court's factual findings. (*Ibid*.) Second, we determine whether these historical facts amount to due diligence by the prosecution, which requires application of an objective, constitutionally-based legal test to the historical facts. (*Ibid*.; see *People v. Sanchez*, *supra*, 63 Cal.4th at p. 440 ["The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially"].)

*3. Defendant's Contentions*

Defendant begins by asserting Pazder's "testimony was the primary source of identity evidence at trial" and "in some ways . . . the most important witness at trial for the defense." But he concedes Pazder testified at the preliminary hearing that she did not recognize defendant at the hospital or at the preliminary hearing and "her description of the clothes worn by the assailant did not match" those worn by defendant when he was

10

detained. In his reply brief, defendant goes so far as to state "Pazder's testimony was in essence a statement that [defendant] was not the man who assaulted her."

Defendant contends, however, that because a police officer testified Pazder had given him a description matching that of defendant, Pazder's absence from trial deprived him of the opportunity of having the jury assess Pazder's credibility. But defendant does not explain how having Pazder repeat her nonrecognition of him and description of his clothing that did not match that given by the officers would have somehow made her more believable at trial or how such testimony benefited the prosecution. If anything, her preliminary hearing testimony assisted the defense more than it helped the prosecution. Pazder may have been only percipient witness to the attack, but her preliminary hearing testimony provided no useful information regarding the identity of the assailant, which, as the trial court found, was the key issue in this case. Her testimony was not thus so "'critical'" or "'vital'" to the prosecution's case, such that greater efforts than that made would have been required. (*People v. Hovey* (1988) 44 Cal.3d 543, 564.)

In any event, defendant has not shown the trial court erred in concluding the prosecution had exercised due diligence in attempting to locate Pazder.

Defendant argues the prosecution waited too long before making any attempt to contact Pazder after the preliminary hearing in June 2013 and then again after receipt of Pazder's August 2013 letter stating she did not wish to be located and was leaving the area. But as the Attorney General points out, the criminal proceedings had been "suspended from August 19, 2013 until October 31, 2013 because defense counsel had declared a doubt as to [defendant's] competency." The district attorney's office thus had no reason to subpoena Pazder during this time period, regardless of whether it would "miss[] several opportunities to locate her and serve her with a subpoena." Had Pazder been subpoenaed only to have the defendant deemed incompetent would have unnecessarily wasted funds and resources. Defendant has cited no authority imposing

11

such a requirement on the prosecution.  Nor would it make sense to subpoena a witness for a matter that has been indefinitely suspended.

Defendant's contention is similar to one made and rejected in *People v. Friend* (2009) 47 Cal.4th 1 (*Friend*), analyzed by defendant.  There the witness (Moody) was a transient alcoholic who "testified at defendant's first trial that defendant admitted he committed the robbery murder." (*Id*. at p. 65.)  The trial court declared a mistrial on the special-circumstance allegation but Moody could not be found for the retrial.  The defendant argued (1) "the prosecutor failed to exercise due diligence in maintaining contact with Moody in the period from March 1990 (when Moody failed to respond to the subpoena for the pretrial discovery hearing) through July 1991 (when the prosecution first began to make concerted efforts to locate him)"; and (2) "the prosecutor should have taken some steps 'to prevent Moody from absenting himself' in the period prior to defendant's second trial." (*Id*. at p. 68.)

As to the first argument, *Friend* concluded that waiting until July 1991 "was not unreasonable given that the second trial, which had been continued several times, was scheduled to begin in September of 1991." (*Friend*, *supra*, 47 Cal.4th at p. 69.)  Nor was it unreasonable in this case for the prosecution to wait until defendant was found competent to stand trial before making efforts to subpoena Pazder.  And even where trial has not been continued, courts have found due diligence when a search was begun shortly before the trial.  (*People v. Linder* (1971) 5 Cal.3d 342, 346 [reversing trial court finding of no reasonable diligence where attempt to subpoena witness began the day before trial]; *People v. Smith* (1971) 22 Cal.App.3d 25, 32 [reasonable diligence found where effort to locate witness began the day before trial].)

Regarding the defendant's second claim, *Friend* noted the rule "'[t]he prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case . . . .'"  [Citations.]  We have also stated that when there is knowledge of 'a "substantial risk"' that an "'important witness would flee,'" the prosecutor is required to

12

'"take adequate preventative measures" to stop the witness from disappearing.'" (*Friend*, *supra*, 47 Cal.4th at p. 68.) *Friend* concluded the record before it did not indicate "the prosecutor had any knowledge of or reason to know of a substantial risk that Moody would flee or otherwise disappear" despite his transient lifestyle. (*Ibid*.)

Here, defendant has not shown Pazder to be an "important witness" in that she did not identify defendant as the perpetrator, in contrast to Moody. She was not critical to the prosecution's case and instead bolstered the defense by pointing the finger away from him. Further, by the time the district attorney's office received Pazder's letter, the trial court had already suspended all criminal proceedings and ordered a competency hearing. At that point, there was no proceeding for Pazder to be a witness in and no need for the prosecution to search for her.

And despite Pazder's letter stating she was moving and did not want to be located, the record before us reflects Solis and the district attorney's office did not know Pazder was homeless until December 2013. The belief was reasonable given Pazder's preliminary testimony she lived in a mobile home. It was also reasonable to assume that if and when she moved, Solis would be able to locate her new address. To that end, Solis was ultimately able to reach one of Pazder's daughters and obtain a new phone number and address for her, although those too proved unfruitful.

Defendant asserts the prosecution knew she was homeless when they received Pazder's August 2013 letter. But he forfeited the claim by failing to support it with any citation to the record. (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384.) Defendant points out that" [d]uring the argument on the motion to admit . . . Pazder's preliminary hearing testimony, defense counsel informed the court that the original police reports indicated that the witness was homeless." Statements of counsel, however, are not evidence. (*In re Zeth S*. (2003) 31 Cal.4th 396, 414, fn. 7.)

Defendant acknowledges "Solis made numerous, sustained, unsuccessful, and admittedly persistent attempts to locate . . . Pazder" from January to May 2014. But he maintains that because she had been spotted here and there, lived in the community, frequently rode buses, and regularly visited certain stores, the only reason the district attorney was unable to locate her was "because it did not employ sufficient resources for the task [and that a] certain amount of extra manpower and resources undoubtedly would surely have gotten her served." But "[i]t is speculative to believe that additional efforts would have resulted in finding" Pazder and getting her to testify. (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 442.) Whatever the amount of effort that would be expended to search for a person with ebola or a murder suspect is irrelevant. This is not such a case and defendant has not persuaded us that Pazder's testimony at trial was either critical or vital to the prosecution's case. (*People v. Hovey*, *supra*, 44 Cal.3d at p. 564.)

"The prosecution must do what is reasonable under the circumstances, not necessarily everything that can be suggested in hindsight." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 442.) The fact that the prosecution could have done more does not mean that its efforts were unreasonable. (*People v. Valencia* (2008) 43 Cal.4th 268, 293.) The prosecution's efforts here were reasonable as set forth in detail above and the trial court did not err in admitting Pazder's preliminary hearing testimony.

Even if the prosecutor failed to exercise due diligence in locating the victim, any error was harmless beyond a reasonable doubt. The prosecution's case rested on the testimony of five police officers, the owner of the store with the surveillance video, and the technician who accessed the videotape, plus the videotape itself. That evidence supported defendant's conviction. Pazder's preliminary hearing testimony added little if any significance to the prosecution's case. And as it was helpful to defendant's case, it could not have prejudiced him.

14

**DISPOSITION**

The judgment is affirmed.


                                                    THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.